| In re | Chapter 11 |
|---|---|
| RADICAL BUNNY, LLC, | Case No. 2:08-bk-13884-CGC |
| Debtor. | |

# DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

Thomas J. Salerno
Jordan A. Kroop
**Squire, Sanders & Dempsey L.L.P.**
Two Renaissance Square, Suite 2700
40 North Central Avenue
Phoenix, Arizona 85004
(602) 528-4000

Counsel to Chapter 11 Trustee

Dated: <u>December 1</u>, 2009

**THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED FOR USE BY ANY PARTY IN THIS CASE. YOU ARE NOT NOW BEING ASKED TO VOTE. YOUR VOTE WILL NOT BE SOLICITED UNLESS AND UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT WITH RESPECT TO A PLAN OF REORGANIZATION. IF AND WHEN THAT OCCURS, YOU WILL RECEIVE A SEPARATE MAILING DESCRIBING THE PLAN VOTING PROCESS.**

# TABLE OF CONTENTS

I.    INTRODUCTION AND SUMMARY ...................................................................... 1

    A.    Overview ................................................................................................... 1
    B.    Notice to Holders of Claims and Equity Interests ................................... 2
    C.    Summary Of Treatment Of Claims And Equity Interests Under The Plan .......... 3
    D.    Voting Procedures, Ballots, and Voting Deadline ................................... 4
    E.    Confirmation Procedures ......................................................................... 5

II.   BACKGROUND REGARDING THE DEBTOR .......................................... 6

    A.    Overview and History ............................................................................. 6

          1.    Mortgages Ltd .............................................................................. 6
          2.    Radical Bunny Claims Against Mortgages Ltd ..................... 6
          3.    ML Plan ........................................................................................ 7
          4.    Radical Bunny Assets .................................................................. 9

    B.    Prepetition Debt Structure ....................................................................... 9
    C.    Prepetition Capital Structure ................................................................. 10
    D.    Events Precipitating the Chapter 11 Case .............................................. 10

III.  SIGNIFICANT EVENTS IN CHAPTER 11 CASE .................................. 10

    A.    Automatic Stay; Administrative Status .................................................. 10
    B.    Appointment of Chapter 11 Trustee ...................................................... 11
    C.    Significant Events During the Chapter 11 Case .................................... 11
    D.    SEC Action Against Radical Bunny, Tom Hirsch, Harish Shah .......... 11

IV.   DESCRIPTION OF THE PLAN ................................................................. 12

    A.    Introduction ........................................................................................... 12
    B.    Summary of Claims Process, Bar Date, and Professional Fees ........... 12
    C.    Classification and Treatment of Claims and Equity Interests, Generally ........... 12
    D.    Treatment of Unclassified Claims ........................................................ 13

          1.    Allowed Administrative Claims ................................................ 13
          2.    Priority Tax Claims .................................................................... 14
          3.    Professional Fees ....................................................................... 14
          4.    Treatment ................................................................................... 14

    E.    Treatment of Classified Claims and Interests ...................................... 15

          1.    Class 1 (Priority Claims) ........................................................... 15
          2.    Class 2 (General Unsecured Claims) ........................................ 16
          3.    Class 3 (Securities Claims) ........................................................ 16
          4.    Class 4 (Equity Interests) ........................................................... 17

V.    IMPLEMENTATION OF THE PLAN ....................................................... 17

    A.    Plan Funding ......................................................................................... 17
    B.    Reorganized RB .................................................................................... 17

          1.    Name ........................................................................................... 17

|  | 2. | Structure | 17 |
|  | 3. | Reorganized RB Manager | 18 |
|  | 4. | Purposes | 18 |
|  | 5. | Disputed Claims | 19 |
|  | 6. | Section 1145 Exemption | 19 |
|  | 7. | Exchange Act Exemption | 19 |
|  | 8. | Restrictions | 19 |

| VI. | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 19 |
|  | A. | Assumption and Rejection of Contracts and Leases | 19 |
|  | B. | Rejection Damages Bar Date | 20 |
|  | C. | Indemnification Obligations | 20 |
|  | D. | Obligations Pertaining to Pass-Through Investors | 20 |

| VII. | DESCRIPTION OF OTHER PROVISIONS OF THE PLAN | 20 |
|  | A. | Vesting of Assets | 20 |
|  | B. | Discharge | 21 |
|  | C. | Injunction | 21 |
|  | D. | Exculpation | 22 |
|  | E. | Avoidance Actions and Litigation Claims | 22 |
|  | F. | Retention of Jurisdiction After the Effective Date | 23 |

| VIII. | ACCEPTANCE AND CONFIRMATION OF THE PLAN | 24 |
|  | A. | Acceptance of the Plan | 24 |
|  | B. | Feasibility of the Plan | 24 |
|  | C. | Best Interests Test | 25 |
|  |  | 1. Explanation | 25 |
|  |  | 2. Application of the Liquidation Analysis | 26 |
|  | D. | Confirmation Over the Dissent of Non-Approving Classes | 27 |

| IX. | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 27 |
|  | A. | Introduction | 27 |
|  | B. | United States Federal Income Tax Consequences to the Debtor | 28 |
|  | C. | Federal Income Tax Consequences to Creditors | 28 |
|  |  | 1. Characterization of Claims | 29 |
|  |  | 2. Accrued Interest | 30 |
|  |  | 3. Market Discount | 31 |
|  |  | 4. Original Issue Discount | 31 |
|  |  | 5. Other Claimholders | 31 |
|  |  | 6. Information Reporting and Backup Withholding | 31 |
|  | D. | Tax Consequences to the Holders of Equity Interests | 32 |
|  |  | 1. Cancellation of Indebtedness ("COD") Income | 32 |
|  |  | 2. Potential Income as a Result of Pass Through Investments | 32 |
|  |  | 3. Minimum Gain Chargeback | 33 |
|  |  | 4. Deemed Distributions | 33 |

     E.     Tax Consequences as a Result of Pass-Through Investments ............................ 34

            1.     Consequences to Debtor for Distributions to Holders of Pass-Through Investments Treated as Holding Debt in the Debtor ................ 34
            2.     Consequences to Debtor for Distributions to Holders of Pass-Through Investments Treated as Holding Equity in the Debtor ............. 35

     F.     Importance of Obtaining Professional Tax Assistance ....................................... 35

X.     RISK FACTORS ....................................................................................................... 36

     A.     Generally .......................................................................................................... 36
     B.     Reorganization Factors ..................................................................................... 37

            1.     Financial Considerations ...................................................................... 37
            2.     Risk of Non-Confirmation of the Plan .................................................. 38

XI.     ALTERNATIVES TO THE PLAN ............................................................................ 38

     A.     Continuation of the Chapter 11 Case ................................................................ 38
     B.     Alternative Plans of Reorganization ................................................................. 38
     C.     Liquidation Under Chapter 7 ............................................................................ 38

XII.     CONCLUSION .......................................................................................................... 39

     A.     Hearing on and Objections to Confirmation ..................................................... 39

            1.     Confirmation Hearing ........................................................................... 39
            2.     Deadline for Objections to Confirmation ............................................. 39

     B.     Recommendation .............................................................................................. 39

APPENDICES TO DISCLOSURE STATEMENT

Appendix 1 – Plan of Reorganization

Appendix 2 – Order Approving Disclosure Statement

Appendix 3 – Radical Bunny Interests in Loan LLCs

Appendix 4 – Selected Financial Information

Appendix 5 – Liquidation Analysis

# I. INTRODUCTION AND SUMMARY

## A. Overview

Radical Bunny, LLC (the "*Debtor*") was the subject of an involuntary Chapter 7 bankruptcy petition under Title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Arizona (the "*Bankruptcy Court*") on October 8, 2008. On October 20, 2008 (the "*Petition Date*"), the Debtor consented to the entry of an order for relief, converting the bankruptcy case to a voluntary Chapter 11 case. On December 30, 2008, the Bankruptcy Court entered an order appointing G. Grant Lyon as the Chapter 11 Trustee. The Bankruptcy Court has approved this disclosure statement (the "*Disclosure Statement*") under Bankruptcy Code § 1125 in connection with confirmation of the Plan of Reorganization (the "*Plan*") proposed by the Chapter 11 Trustee in this case (the "*Chapter 11 Case*"). The Plan was filed with the Bankruptcy Court on October 19, 2009. The following introduction and summary is a general overview only and is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements appearing elsewhere in this Disclosure Statement and the Plan. All capitalized terms not defined in this Disclosure Statement have the meanings given to them in the Plan. A copy of the Plan, separately filed in the Chapter 11 Case, is **Appendix 1** to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the circumstances giving rise to this Chapter 11 Case, significant events that have occurred during the Chapter 11 Case, and the anticipated reorganization of the Debtor. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and how voting on the Plan will occur. Certain provisions of the Plan, and the descriptions and summaries contained in this Disclosure Statement, may be the subject of continuing negotiations among the Debtor and various parties, may not have been finally agreed on, and may be modified. Those modifications, however, will not have a material effect on the distributions contemplated by the Plan.

The Chapter 11 Trustee is the proponent of the Plan within the meaning of Bankruptcy Code § 1129. The Plan contains separate Classes and proposes recoveries for holders of Claims against and Equity Interests in the Debtor. After careful review of the Debtor's current financial condition, estimated recoveries in a liquidation scenario, and the Debtor's future prospects, the Chapter 11 Trustee has concluded that the recovery to Creditors will be maximized by the reorganization of the Debtor as contemplated by the Plan.

Specifically, the Chapter 11 Trustee believes that the activities of Reorganized RB to be undertaken after confirmation of the Plan provides Creditors and holders of Equity Interests with the maximum possible recovery under the circumstance. This conclusion is demonstrated by the liquidation analysis prepared by the Chapter 11 Trustee's financial advisors.

**B.      Notice to Holders of Claims and Equity Interests**

> **For the sake of clarity, ~~so-called "~~investors~~" or participants~~ in Radical Bunny are called "Participants" under the Plan. Participants have Claims and are considered Creditors for purposes of the Plan. Except for RB Insiders, Participants are NOT holders of any other interests, including Equity Interests, in Radical Bunny.**

This Disclosure Statement is being used to solicit votes on the Plan only from holders of impaired Claims, and is being transmitted to Creditors with unimpaired Claims and to Equity Holders other parties in interest for informational purposes. The purpose of this Disclosure Statement is to provide adequate information to enable the holder of an impaired Claim to make a reasonably informed decision with respect to the Plan before voting to accept or reject the Plan.

On November ___, 2009 the Bankruptcy Court entered an order, attached as **Appendix 2** to this Disclosure Statement, approving this Disclosure Statement as containing information of a kind and in sufficient and adequate detail to enable Creditors to vote on the Plan as required by Bankruptcy Code § 1125. **The Bankruptcy Court's approval of this Disclosure Statement does not constitute either a guaranty of the accuracy or completeness of the information contained in this Disclosure Statement or the Bankruptcy Court's endorsement of the Plan.**

Holders of Claims are encouraged to read this Disclosure Statement and its appendices carefully and completely before deciding to accept or reject the Plan. If a description in this Disclosure Statement and a term of the Plan conflict, the Plan governs.

This Disclosure Statement and the other materials included in the solicitation package are the only documents authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained in this Disclosure Statement.

Certain of the information contained in this Disclosure Statement is by its nature forward-looking and contains estimates, assumptions and projections that may be materially different from actual or future results. Except as otherwise specifically stated, this Disclosure Statement does not reflect any events that may occur after the date of this Disclosure Statement and that may have a material impact on the information contained in this Disclosure Statement. Neither the Chapter 11 Trustee nor Reorganized RB intend to update the information contained in this Disclosure Statement.

The financial information contained in this Disclosure Statement has not been audited by a certified public accountant and may not have been prepared in accordance with generally accepted accounting principles.

This Disclosure Statement has been prepared in accordance and compliance with Bankruptcy Code § 1125 and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law. This Disclosure Statement has been neither approved nor disapproved by the Securities and Exchange Commission (the "*SEC*"), nor

has the SEC passed on the accuracy or adequacy of the statements contained in this Disclosure Statement.

This Disclosure Statement may not be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan on holders of Claims against, or Equity Interests in, the Debtor.

**C.    Summary Of Treatment Of Claims And Equity Interests Under The Plan**

The Plan constitutes a plan of reorganization for the Debtor. The Plan contains definitions and rules of interpretation and provides the treatment of separate classes for holders of Claims against, and Equity Interests in, the Debtor. As provided by Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interests under the Plan. The classification and treatment for all Classes are described in more detail in Section IV of this Disclosure Statement and Articles 2 and 3 of the Plan.

| Class | Description | Treatment |
|---|---|---|
| 1 | Priority Claims<br><br>**(Unimpaired; deemed to accept)** | Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as practicable; (ii) 30 days after the Priority Claim is Allowed; and (iii) when sufficient Cash becomes available from Reorganized RB's post-Effective Date receipts; unless, before the later of these three dates, the holder of the Claim and Reorganized RB agree in writing to a different date. |
| 2 | Unsecured Claims<br><br>**(Impaired; entitled to vote)** | Except with respect to the Participant Claims of the RB Insiders, each holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of its Allowed Class 2 Claim, Pro Rata payment from Reorganized RB's assets after payment of Allowed Administrative Claims and Allowed Priority Claims and operating expenses of Reorganized RB in accordance with the Reorganized RB Manager's discretion. No holder of a Pass-Through Investment has a Claim against the Debtor or will receive any distribution under the Plan on account of that holder's Pass-Through Investment. If any holder of a Pass-Through Investment also is the holder of a Participant Claim, that holder will receive the treatment stated above solely on account of that Participant Claim and not on account of the Pass-Through Investment. All Claims of all RB Insiders are Disputed Claims. As an accommodation to non-RB Insider Participants, the RB Insiders will be deemed to have voluntarily subordinated their Claims in Class 2, including any Participant Claims they hold, to all other Claims in Class 2. Accordingly, the RB Insiders will receive no distribution under the Plan on account of their Claims unless and until all other Allowed Claims in Class 2 are paid in full, with interest at the applicable legal rate, from the Petition Date through the date of final payment. If one or more RB Insiders objects to the |

| Class | Description | Treatment |
|-------|-------------|-----------|
| | | treatment of its Claim under the Plan by filing a written objection by no later than the Bankruptcy Court-established deadline for objections to confirmation of the Plan, the Trustee reserves the right to commence an adversary proceeding seeking equitable subordination of that RB Insider's Claim under Bankruptcy Code § 510(c). Because their Claims are subordinated under the Plan, and because they are insiders of the Debtor, the RB Insiders are not entitled to vote to accept or reject the Plan. |
| 3 | Securities Claims<br><br>**(Impaired; deemed to reject)** | Under Bankruptcy Code § 510(b), each Securities Claim is mandatorily subordinated to all other Claims. Accordingly, the holders of Securities Claims will not receive or retain any rights, property, or distributions on account of their Securities Claims under the Plan. |
| 4 | Equity Interests<br><br>**(Impaired; deemed to reject)** | As of the Effective Date, all Equity Interests will not have any positive value based on the Effective Date balance sheet included in the Disclosure Statement. Although the holders of Equity Interests will nominally be the members of Reorganized RB, those membership interests are intended and expected to have negative value. Accordingly, the holders of Equity Interests will not receive or retain any rights, property, or distributions of any value on account of their Equity Interests under the Plan. |

### D.    Voting Procedures, Ballots, and Voting Deadline

Accompanying this Disclosure Statement are, among other things, copies of: (1) the Plan (**Appendix 1** and separately filed in this Chapter 11 Case); (2) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider confirmation of the Plan, and the time for filing objections to the confirmation of the Plan (the "Confirmation Hearing Notice"); and (3) if you are entitled to vote, a Ballot (and return envelope along with detailed instructions accompanying the Ballot) to be used in voting to accept or reject the Plan.

After carefully reviewing the Plan, this Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by completing the Ballot. You must provide all the information requested on the Ballot; failure to do so may result in your vote being disqualified.

For your vote to be counted, your Ballot must be properly completed and **ACTUALLY RECEIVED** no later than January 4, 2010 at 5:00 p.m. Arizona Time (the "*Voting Deadline*") by counsel for the Chapter 11 Trustee. Your Ballot contains the address and contact information for the Chapter 11 Trustee's counsel.

**Ballots should NOT be sent to the Debtor, the Committee or its counsel, the Chapter 11 Trustee, the Bankruptcy Court, the U.S. Trustee, or any other party other than the Chapter 11 Trustee's Counsel. Ballots not received by the Voting Deadline by the Chapter 11 Trustee's counsel will not be counted.**

If: (1) you have any questions about the procedure for voting or the packet of materials that you have received; or (2) you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to either of those documents, please contact: Karen Graves; Squire, Sanders & Dempsey L.L.P.; 40 North Central Avenue, Suite 2700; Phoenix, AZ 85004; Telephone: (602) 528-4000; e-mail kgraves@ssd.com.

### E.     Confirmation Procedures

Under Bankruptcy Code § 1126(f), if a class of claims or interests is unimpaired under a plan, that class (and each member of that class) is conclusively presumed to have voted in favor of the plan and is not solicited to vote on the plan. In this Chapter 11 Case, the Plan contains three Classes of Creditors and one Class of Equity Interests. All Unclassified Claims and Claims in Class 1 are unimpaired by the Plan and holders of such Claims are presumed to have voted in favor of the Plan and will not be solicited to vote on the Plan. All Claims in Class 2 are impaired and holders of such Claims (including all Participants other than RB Insiders) are entitled to vote to accept or reject the Plan. Classes 3 and 4 under the Plan (Securities Claims and Equity Interests) are impaired under the Plan; members of those Classes will neither receive nor retain any property on account of their Securities Claims or Equity Interests. Accordingly, members of Classes 3 and 4 are deemed to reject the Plan and will not be solicited to vote on the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to begin on January ____, 2010 at _____ __.m. (Arizona time) before the Honorable Charles G. Case, United States Bankruptcy Judge, at the United States Bankruptcy Court, 203 North 1st Avenue, Phoenix, Arizona 85004. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for an announcement of the adjournment date made at the Confirmation Hearing. The Bankruptcy Court has ordered that any objections to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are actually received on or before January 4, 2010, at 5:00 p.m. (Arizona time) by:

*Counsel to the Chapter 11 Trustee:*
**SQUIRE, SANDERS & DEMPSEY L.L.P.**
    Two Renaissance Square
    40 North Central Avenue, Suite 2700
    Phoenix, Arizona 85004
    Attn:   Jordan A. Kroop, Esq.
            Thomas J. Salerno, Esq.
    Telephone: (602) 528-400

*The United States Trustee:*
**OFFICE OF THE U.S. TRUSTEE**
203 North 1st Avenue
Phoenix, Arizona 85003
Attn: Larry Watson, Esq.
Telephone: (602) 682-2600

**THE CHAPTER 11 TRUSTEE BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR THE HOLDERS OF CLAIMS. THE CHAPTER 11 TRUSTEE STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN AND SUPPORT CONFIRMATION OF THE PLAN.**

## II.    BACKGROUND REGARDING THE DEBTOR

### A.    Overview and History

Radical Bunny, LLC is an Arizona limited liability company created to solicit investments from individuals and personal trusts, combine those investments, and make loans to Mortgages Ltd., a private lender operating in Arizona making loans for commercial, industrial, and residential properties for acquisition, entitlement, development, construction, and investment. Radical Bunny did not and does not conduct any business other than making loans to Mortgages Ltd. Radical Bunny has no employees and does not intend to hire any regular employees at any time in the future.

### 1.    *Mortgages Ltd.*

All Mortgages Ltd. loans to its borrowers were intended to be short-term loans secured by real estate, including multifamily and residential projects, office buildings, and mixed-use projects within Arizona. Among many other sources of funds for such loans, Mortgages Ltd., largely through the active participation of its principal, Scott Coles, obtained loans from Radical Bunny. Participants in Radical Bunny, with but a few exceptions, do not hold direct interests in any Mortgages Ltd. loans. Rather, Radical Bunny Participants have Claims against Radical Bunny, which, in turn, loaned moneys to Mortgages Ltd. under approximately 98 separate promissory notes.

As the real estate market began to deteriorate in Arizona and throughout the country, Mortgages Ltd.'s loans became increasingly more distressed. Mortgages Ltd.'s ability to produce and distribute returns to its own investors and lenders (including Radical Bunny) began to deteriorate as well. Scott Coles, who served as Mortgages Ltd.'s chairman and chief operating officer since November 1992, committed suicide on June 2, 2008, leaving a management void at Mortgages Ltd. Less than three weeks later, on June 20, 2008, a group of Mortgages Ltd. borrowers filed an involuntary bankruptcy petition against Mortgages Ltd. On June 24, 2008, Mortgages Ltd. converted its case to a voluntary Chapter 11 case.

### 2.    *Radical Bunny Claims Against Mortgages Ltd.*

Radical Bunny asserted that, by the time Mortgages Ltd.'s bankruptcy case began, Radical Bunny had lent approximately $197 million to Mortgages Ltd. under approximately 98 promissory notes. Radical Bunny also asserted that the total $197 million in loans was secured by a lien in substantially all Mortgages Ltd.'s assets, including all its interests in Mortgages Ltd.'s loans to borrowers (approximately $162 million) and all real estate owned by Mortgages Ltd. Radical Bunny's alleged security interest was the subject of substantial dispute in the Mortgages Ltd. bankruptcy case, with Mortgages Ltd., the Mortgages Ltd. investors' committee, the Mortgages Ltd. unsecured creditors' committee, and other parties-in-interest asserting that Radical Bunny's security interest in Mortgages Ltd.'s assets was invalid or unenforceable under various legal theories. The amount of Radical Bunny's claims against Mortgages Ltd. was never seriously in dispute.

3. *ML Plan*

On May 20, 2009, the Bankruptcy Court confirmed the plan of reorganization for Mortgages Ltd. after an extensively litigated trial in which Radical Bunny's Chapter 11 Trustee participated heavily. As part of that confirmation trial, at which the Chapter 11 Trustee for Radical Bunny opposed confirmation of the Mortgages Ltd. plan (proposed by Mortgages Ltd.'s investor committee), the dispute regarding the validity and extent of Radical Bunny's secured status as against Mortgages Ltd.'s assets case became a central issue. Exercising his best business judgment and in close consultation with his counsel and counsel for Radical Bunny's creditors' committee, the Chapter 11 Trustee agreed to a settlement of Radical Bunny's secured status with the Mortgages Ltd. investors' committee and agreed to support confirmation of the Mortgages Ltd. plan, which was then amended to accommodate the settlement between the Chapter 11 Trustee and the Mortgages Ltd. investors' committee.

The Mortgages Ltd. plan as confirmed by the bankruptcy court (the "*ML Plan*") recognizes and eliminates all disputes as to the validity and extent of Radical Bunny's secured claim against Mortgages Ltd. in the approximate amount of $162 million. The ML Plan also allows Radical Bunny's unsecured claim against Mortgages Ltd. for approximately $35 million. The ML Plan created two basic sources for recovery to all Mortgages Ltd. creditors, including Radical Bunny.

The first source, is a liquidating trust (the "*ML Trust*"), run by a five-member board and a liquidating trustee, Kevin O'Halloran—an experienced bankruptcy trustee and receiver from Atlanta, Georgia—vested with various Mortgages Ltd. assets, including all real property owned outright by Mortgages Ltd. and all causes of action and potential lawsuits against various defendants (including, potentially, the estate of Scott Coles, various Coles-related trusts, and Mortgages Ltd.'s pre-bankruptcy professionals). Radical Bunny is now a beneficiary of the ML Trust for approximately $35 million plus any deficiency resulting from recoveries out of the Loan LLCs (described below), with the added benefit, negotiated by the Chapter 11 Trustee, of an "Accelerated Recovery" vis-à-vis other beneficiaries of the ML Trust. Radical Bunny is entitled to receive an Accelerated Recovery in the amount of $25 million from the ML Trust along with the "Revolving Opportunity Investor" (the "*RevOps*") interests' Accelerated Recovery in the amount of $10 million until Radical Bunny and the RevOps receive an Accelerated Recovery totaling $35 million, at which time both Radical Bunny and the RevOps will return to a basic pro rata share with the rest of the beneficiaries of the ML Trust. In this context, "Accelerated Recovery" means available payments for distribution from the ML Trust (after repayment of the ML Exit Financing (defined and described below), the ML Trust's operating expenses, and a $2 million priority payment to ordinary course trade creditors of Mortgages Ltd.) equal to their pro rata share of total beneficiary interests in the ML Trust multiplied by 110%. For example, assuming Radical Bunny and the RevOps interests make up 30% of the beneficiary interests in the ML Trust, and they receive an Accelerated Recovery equaling 110% of every net dollar that comes into the ML Trust, then they would receive 33% (30% multiplied by 110%) of the available distribution, and the other beneficiary interests in the ML Trust would receive 67% until the total $35 million is recovered.

The second source of recovery for Mortgages Ltd. creditors and investors are a series of loan-specific limited liability companies ("*Loan LLCs*"). Each Loan LLC is the owner of a

presently-outstanding loan made by Mortgages Ltd. The members (*i.e.,* owners) of each Loan LLC are the Mortgages Ltd. investors that made investments specifically in that Mortgages Ltd. loan. Radical Bunny, for the most part, did *not* have direct investments in any specific Mortgages Ltd. loans, but by virtue of its security interest in Mortgages Ltd.'s assets as affirmed in the ML Plan, Radical Bunny is now the owner of all membership interests in the various Loan LLCs representing the portions of the Mortgages Ltd. loans retained by Mortgages Ltd. In this fashion, the approximately $162 million secured claim Radical Bunny had against Mortgages Ltd. has been satisfied by awarding Radical Bunny various interests in the Loan LLCs, which in the aggregate total $162 million in face amount of loans to Mortgages Ltd. borrowers. A list of all Radical Bunny's interests in Loan LLCs is **Appendix 3** to this Disclosure Statement.

The extent of Radical Bunny's return on its interests in the Loan LLCs is directly related to the success of the Loan LLCs in collecting on the loans originally made by Mortgages Ltd. to its various borrowers. Most of the loans owned by the Loan LLCs are now in default. The timing and amounts of recoveries on those loans is uncertain in many respects. Under the ML Plan, however, one entity—the ML Manager, LLC—has been created to supervise, run, and service all the loans owned by the various Loan LLCs. The ML Manager is itself run by a five-person board (a different five people from those comprising the ML Trust board), and Radical Bunny has the right to appoint one member of that board. Currently, David Fieler (also a member of Radical Bunny's creditors' committee) serves in that capacity. The ML Manager is empowered to make all ordinary course decisions pertaining to the various loans owned by the Loan LLCs and is charged with the general responsibility of maximizing the value and performance of those loans. A Loan LLC does, however, retain the right to make "major decisions" with respect to its loan—most notably, a disposition, settlement, or other final resolution of a loan for less than 75% of the face amount of the principal and accrued interest on the loan. Any other decisions are made by the ML Manager. "Major decisions" are made by majority vote among the members of a particular Loan LLC, with each member voting its percentage interest in the loan owned by that Loan LLC. For those loans in which Radical Bunny owns a majority of the face amount, Radical Bunny's decision will control the decision of the applicable Loan LLC for all "major decisions."

To fund the ML Trust's operations (including the investigation and hiring of professionals to pursue causes of action and lawsuits and the liquidation of real estate), the ML Manager's operations (including the servicing of all loans in the Loan LLCs), the repayment of a secured loan to Mortgages Ltd. during the Mortgages Ltd. bankruptcy case, and to pay the fees for professionals representing Mortgages Ltd. and the Mortgages Ltd.'s two official committees, the ML Plan provided for approximately $20 million of secured debt financing (the "*ML Exit Financing*"). To secure repayment of the ML Exit Financing, the lenders (collectively, the "*ML Exit Lender*") have a first-priority security interest in all assets of the ML Trust and all loans in the Loan LLCs. Recoveries from assets in the ML Trust and recoveries from the Loan LLCs' borrowers must first be used to repay portions of the ML Exit Financing in accordance with a formula designed to ensure that no one piece of the ML Exit Lender's collateral, no one Loan LLC, and no individual Mortgages Ltd. creditor bears a disproportionate or unfair burden of repaying the ML Exit Financing. Among other things, the ML Manager will be responsible for monitoring and implementing the formula to ensure fairness, to repay the ML Exit Financing as quickly as possible, and to maximize recoveries to the Loan LLCs and the beneficiaries of the ML Trust.

4.    *Radical Bunny Assets*

As a result of the confirmation and implementation of the ML Plan, Radical Bunny's assets comprise the following:

(a)  Approximately $162 million (face amount) in membership interests in various Loan LLCs—these are listed on **Appendix 3** to this Disclosure Statement;

(b)  Beneficial interest in the ML Trust of approximately $35 million plus any deficiency from the Loan LLCs;

(c)  Radical Bunny's own potential causes of action and lawsuits against, among others, the estate of Scott Coles and other Coles-related trusts and entities (for such possible causes of action as fraud and breach of fiduciary duty), pre-bankruptcy professionals (lawyers, accountants, and auditors including Quarles & Brady, Greenberg Traurig, all accountants for the Debtor, all accountants for Mortgages Ltd., and all auditors for Mortgages Ltd.) [1] representing Radical Bunny (for such possible causes of action as malpractice, various levels of negligence, and breach of fiduciary duty), and the RB Insiders (including Tom Hirsch, Harish Shah, and the other owners of Radical Bunny) (for such possible causes of action as fraud and breach of fiduciary duty)—these are *not* part of the ML Trust and are *not* subject to the claims of any Mortgages Ltd. creditors.

These are the assets that will provide the source of all recoveries for Creditors (including Participants) of the Debtor in this Chapter 11 Case, Radical Bunny. Accordingly, the amount and timing of recoveries under the Radical Bunny Plan will depend directly on the performance of the Loan LLCs and the ML Trust.

As a result of the Plan in this Chapter 11 Case, Radical Bunny will not conduct any business other than managing and ultimately monetizing the above-listed assets for the benefit of Radical Bunny's Creditors (nearly all of whom are Participants). Radical Bunny will not, at any time in the future, solicit any new investments or make any new loans to any entity. Radical Bunny's existence after confirmation of the Plan will be limited solely to the actions necessary to maximize the value of Radical Bunny's existing assets and distribute the cash generated to Creditors (including Participants).

## B.    Prepetition Debt Structure

At no time did the Debtor incur significant secured debt. With few, economically insignificant exceptions, the Debtor's sole debts were in the nature of Participant funds advanced to the Debtor in response to what the Chapter 11 Trustee believes may be fairly characterized as

---

[1] The failure to name a particular potential defendant of an Avoidance Action or Litigation Claim in this Disclosure Statement should not be deemed a waiver of any Avoidance Action or Litigation Claim against any person. The Estate reserves all rights to amend this Disclosure Statement to include additional potential defendants and reserves all rights to pursue Avoidance Actions and Litigation Claims against any person, whether named or unnamed in this Disclosure Statement.

offering memoranda. (The Debtor's management aggregated these funds to make the 98 loans to Mortgages Ltd.) As a result, total Unsecured Claims against the Debtor match closely the total Participant Claims against the Debtor—approximately $197 million. The Chapter 11 Trustee is unaware of significant Priority Claims against the Debtor that would be classified in Class 2 under the Plan (with the possible exception of certain expenses allegedly incurred by the petitioning creditors responsible for filing the involuntary bankruptcy petition against Radical Bunny). Other than Securities Claims in Class 3, mandatorily subordinated to all other Claims, the only other Claims against the Debtor are Administrative Expense Claims, which themselves are almost entirely Professional Fee Claims of the Debtor's counsel, the Chapter 11 Trustee, the Chapter 11 Trustee's counsel and financial advisors, and the Committee's counsel. These Professional Fee Claims are described further and quantified below.

### C.     Prepetition Capital Structure

The Debtor is an Arizona limited liability company, who members are Tom Hirsch, Howard Walder, and Harish Shah.

### D.     Events Precipitating the Chapter 11 Case

As described above, the deterioration of the real estate market and the resulting financial distress of Mortgages Ltd., severely exacerbated by Scott Coles' sudden death, resulted in the bankruptcy of Mortgages Ltd., the sole source of recovery for Radical Bunny's loans. With Mortgages Ltd.'s bankruptcy and financial collapse, Radical Bunny's interests and financial affairs were jeopardized, and those financial affairs are now being resolved in the context of this Chapter 11 Case.

The Chapter 11 Trustee believes that, beginning before the Chapter 11 Case began and before Scott Coles' suicide, federal and state securities authorities had begun investigations of securities law violations and other wrongdoing by principals of Mortgages Ltd., as well as principals of Radical Bunny, including Tom Hirsch and Harish Shah. Looming investigations of Radical Bunny and its principals by state and federal authorities further necessitated a structured reorganization of Radical Bunny's financial affairs.

## III.     SIGNIFICANT EVENTS IN CHAPTER 11 CASE

### A.     Automatic Stay; Administrative Status

The Chapter 11 Case was assigned to the Honorable Charles G. Case, United States Bankruptcy Judge for the District of Arizona. Initially, the Debtor operated as a debtor-in-possession under Bankruptcy Code §§ 1107 and 1108. The Debtor hired DeConcini, McDonald, Yetwin & Lacy as its special counsel and Allen & Sala as its general bankruptcy counsel. An Official Committee of Unsecured Creditors was appointed in the Chapter 11 Case on November 13, 2008. The members of the Committee are: (i) Thomas Lewandowski; (ii) Deborah Roff; (iii) David Fieler; (iv) Visnu Patel; and (v) Anthony Aiello. The Committee hired Perkins Coie Brown & Bain P.A. as its bankruptcy counsel.

An immediate effect of the commencement of the Chapter 11 Case was the imposition of the automatic stay under Bankruptcy Code § 362 that, with limited exceptions, enjoined the

commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor, and the commencement or continuation of litigation against the Debtor. This relief provided the Debtor with the "breathing room" necessary to assess and reorganize its business. The automatic stay remains in effect, unless modified by the Bankruptcy Court, until consummation of the Plan.

## B.    Appointment of Chapter 11 Trustee

As the federal and state investigations against Tom Hirsch and Harish Shah continued after the Petition Date, at least some Participants believed that the Debtor's management could not adequately serve Participants' needs in the Chapter 11 Case. Certain Participants moved the Bankruptcy Court for an order appointing a Chapter 11 Trustee to displace the Debtor's management and run the Chapter 11 Case for the benefit of Creditors and Participants. After some initial litigation over the propriety of such an appointment, and following the decision of the U.S. Trustee's office to independently seek the appointment of a trustee, the Debtor, the moving Participants, and the Committee all agreed to the appointment of G. Grant Lyon as the Chapter 11 Trustee. Mr. Lyon began serving as Chapter 11 Trustee on December 30, 2008. The Chapter 11 Trustee hired Squire, Sanders & Dempsey as his general bankruptcy counsel, the DeConcini firm as his special counsel, and Odyssey Capital as his financial advisor.

## C.    Significant Events During the Chapter 11 Case

Aside from the appointment of the Chapter 11 Trustee, substantially all the activity in the Chapter 11 Case for the first nine months after the Chapter 11 Trustee began serving was devoted to the investigation, analysis, and strategizing with respect to the plan process in the Mortgages Ltd. bankruptcy case. In close consultation with the Committee, the Chapter 11 Trustee conducted extensive negotiations with various parties in the Mortgages Ltd. case over the course of several months, culminating in a highly-litigated plan confirmation trial that resulted in the confirmation of the ML Plan and the resolution of several critical disputes regarding Radical Bunny's rights described above.

As soon as the ML Plan was confirmed and consummated, the Chapter 11 Trustee was in a position to begin formulating a reorganization of the Debtor's financial affairs. After extensive discussions and analysis with the Committee, the Chapter 11 Trustee prepared and filed the Plan and this Disclosure Statement.

## D.    SEC Action Against Radical Bunny, Tom Hirsch, Harish Shah

On July 28, 2009, the SEC filed suit in the U.S. District Court against Radical Bunny, Tom Hirsch, Harish Shah, Berta "Bunny" Walder, and Howard Walder for various violations of federal securities laws and securities fraud in connection with the solicitation of investments into Radical Bunny from Participants and Radical Bunny's dealings with Mortgages Ltd. The SEC's complaint seeks affirmative damages and injunctive relief against all defendants, but negotiations between the Chapter 11 Trustee and the SEC has focused on the entry of a consent decree that would resolve the action as against Radical Bunny only (not Tom Hirsch, Harish Shah, or the Walders) by having Radical Bunny agree not to solicit investments in the future and not to conduct business other than to monetize existing assets for the benefit of Radical Bunny's

innocent Participants. The SEC's action against Tom Hirsch, Harish Shah, and the Walders will continue; neither the Chapter 11 Trustee nor Reorganized RB will participate in that action other than providing whatever documents or other materials the SEC may require. The Chapter 11 Trustee believes, based on discussions with federal and state authorities, that Tom Hirsch, Harish Shah, and the Walders may soon also be the subject of additional civil actions or criminal prosecutions, or both, by state and federal authorities. Those actions may frustrate Reorganized RB's efforts to collect on potential claims against RB Insiders in the future.

## IV.      DESCRIPTION OF THE PLAN

### A.      Introduction

This section provides a summary of the Plan's structure, classification, treatment, and implementation. Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to in the Plan, this Disclosure Statement is not a precise or complete statement of all the terms and provisions of the Plan or documents referred to in the Plan. Refer to the Plan and its exhibits for a complete statement of all the Plan's terms.

The Plan itself and the documents it refers to will control the treatment of holders of Claims against, and Equity Interests in, the Debtor under the Plan and will, on the Effective Date, be binding on all parties-in-interest, including holders of Claims against, and Equity Interests in, the Debtor and Reorganized RB.

### B.      Summary of Claims Process, Bar Date, and Professional Fees

The Bankruptcy Court entered an order (the "*Bar Date Order*") setting December 1, 2009 as the deadline for filing proofs of claim against the Debtor (the "*Bar Date*"). The Bar Date excludes certain Claims, including Administrative Claims, Professional Fee Claims, and Claims based on the rejection of executory contracts and unexpired leases following entry of the Bar Date Order, as to which the bar date is controlled by provisions of the Plan and orders of the Bankruptcy Court authorizing the rejection of contracts or leases. The Chapter 11 Trustee's counsel provided notice of the Bar Date by mailing to each person listed in the Schedules a notice of the Bar Date, a copy of the Bar Date Order, and a proof of claim form.

All Administrative Claims, Professional Fee Claims and Rejection Claims must be filed on or before the date that is the first Business Day that is 30 days after the Confirmation Date.

### C.      Classification and Treatment of Claims and Equity Interests, Generally

Bankruptcy Code § 1122 requires that a plan of reorganization classify the claims of a debtor's creditors and the interests of its equity holders. The Bankruptcy Code also provides that, except for certain claims classified for administrative convenience, a plan of reorganization may place a claim of a creditor or an interest of an equity holder in a particular class only if the claim or interest is substantially similar to the other claims or interests of that class. The Bankruptcy Code also requires that a plan of reorganization provide the same treatment for each claim or interest of a particular class unless the holder of a particular claim or interest agrees to a less favorable treatment of its claim or interest.

The Chapter 11 Trustee believes that it has classified all Claims and Equity Interests in compliance with the requirements of the Bankruptcy Code. If a holder of a Claim or Equity Interest challenges the Plan's classification of Claims or Equity Interests and the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Chapter 11 Trustee, to the extent permitted by the Bankruptcy Court, intends to modify the classifications of Claims or Equity Interests under the Plan to provide for whatever classification might be required by the Bankruptcy Court for confirmation. Except if a modification of classification adversely affects the treatment of a holder of a Claim or Equity Interest, acceptance of the Plan by any holder of a Claim or Equity Interest will be deemed to be a consent to the Plan's treatment of the holder of a Claim or Equity Interest regardless of the class as to which that holder ultimately is deemed to be a member.

**D.      Treatment of Unclassified Claims**

As provided in Bankruptcy Code § 1123(a)(1), Administrative Claims and Priority Tax Claims are not classified for purposes of voting on, or receiving distributions under, the Plan. Holders of Administrative Claims and Priority Tax Claims are not entitled to vote on the Plan but, rather, are treated separately in accordance with Sections 2.02 and 2.03 of the Plan and under Bankruptcy Code § 1129(a)(9)(A).

1.      *Allowed Administrative Claims*

An Administrative Claim is a Claim for any cost or expense of administration of the Chapter 11 Case Allowed under Bankruptcy Code §§ 503(b), 507(b) or 546(c)(2) and entitled to priority under Bankruptcy Code § 507(a)(2), including: (a) fees payable under 28 U.S.C. § 1930; (b) actual and necessary costs and expenses incurred in the ordinary course of the Debtor's business; (c) actual and necessary costs and expenses of preserving the Estate or administering the Chapter 11 Case; and (d) all Professional Fee Claims to the extent Allowed by Final Order under Bankruptcy Code §§ 330, 331, or 503.

The Debtor estimates that, assuming an Effective Date of January 1, 2010, unpaid Administrative Claims will total approximately $2,337,000, comprising:

| Administrative Claim | Estimated Amt. |
|---|---|
| **Allen & Sala –** Counsel to the Debtor | $ 87,000 |
| **DeConcini, McDonald, Yetwin & Lacey –** Special Counsel to Estate | $ 1,200,000 |
| **Perkins Coie Brown & Bain –** Counsel to Committee | $ 450,000 |
| **G. Grant Lyon –** Chapter 11 Trustee | $ 150,000 |
| **Squire, Sanders & Dempsey –** Counsel to Chapter 11 Trustee | $ 800,000 |
| **Odyssey Capital –** Financial Advisor to Chapter 11 Trustee | $ 500,000 |
| **TOTAL** | **$ 2,337,000** |

2. *Priority Tax Claims*

These are Claims of a Governmental Unit for taxes entitled to priority under Bankruptcy Code § 507(a)(8). The Chapter 11 Trustee does not believe there are any substantial Priority Tax Claims.

3. *Professional Fees*

Claims for Professional Fees are Claims of Professionals, including an entity (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Bankruptcy Code §§ 327, 328, 363, or 1103 and to be compensated for services under Bankruptcy Code §§ 327, 328, 329, 330, and 331 or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b).

4. *Treatment.*

(i)    Allowed Administrative Claims. Each Allowed Administrative Claim (other than a Professional Fee Claim) will be paid in full in Cash (or otherwise satisfied in accordance with its terms) on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) any date the Bankruptcy Court may fix, or as soon after that date as practicable; (c) 30 days after the Claim is Allowed; (d) any date on which the holder of the Claim and the Trustee or Reorganized RB agree; and (e) when sufficient Cash becomes available from Reorganized RB's post-Effective Date receipts.

(iii)    Allowed Priority Tax Claims. Any Allowed Priority Tax Claim will be paid in full in Cash on the latest of: (a) the Effective Date (or as soon after that date as practicable); (b) 30 days after the Claim is Allowed; and (c) when sufficient Cash becomes available from Reorganized RB's post-Effective Date receipts. The Trustee or Reorganized RB may elect to pay any Allowed Priority Tax Claim through regular installment payments in Cash of a total value, as of the Effective Date, equal to the Allowed amount of the Claim, over a period ending not later than five years after the Petition Date, and in a manner not less favorable than the most favored General Unsecured Claim provided for by the Plan. If the Trustee or Reorganized RB so elect, the installment payments will be made in equal quarterly installments of principal plus interest, at a rate determined under applicable nonbankruptcy law, on the unpaid portion of the Allowed Priority Tax Claim accruing from the Effective Date. The first payment will be made on the latest of: (a) the Effective Date, or as soon after that date as practicable; (b) 30 days after the Claim is Allowed, or as soon after than date as practicable; (c) another date on which the holder of the Claim and the Trustee or Reorganized RB agree; and (d) when sufficient Cash becomes available from Reorganized RB's post-Effective Date receipts. Reorganized RB retains the right to prepay any Allowed Priority Tax Claim, or any remaining balance of such a Claim, in full or in part, at any time on or after the Effective Date without premium or penalty.

(iv)    Professional Fee Claims. Each Allowed Professional Fee Claim will be paid in full in Cash on the latest of: (a) three days after the Professional Fee Claim is Allowed;

(b) another date on which the holder of the Professional Fee Claim and the Trustee or Reorganized RB agree; and (c) when sufficient Cash becomes available from Reorganized RB's pre- and post-Effective Date receipts. Each Person seeking an award by the Bankruptcy Court of Professional Fees must file with the Bankruptcy Court and serve on Reorganized RB its final application for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date by the Professional Fee Bar Date. **Bankruptcy Code § 1129(a)(9) requires that all Administrative Claims (including Professional Fee Claims) be paid in Cash, in full, on the Effective Date of the Plan. As an accommodation to the Participants, and in recognition that paying all Professional Fee Claims in full on the Effective Date of the Plan would require Reorganized RB to borrow millions of dollars on a secured basis, ahead of Participant Claims (in a manner substantially identical to Mortgages Ltd.), all Professionals have voluntarily agreed to await payment of their Professional Fee Claims until Reorganized RB has generated sufficient pre- or post-Effective Date receipts to pay those Professional Fee Claims.**

All claims of Professionals for services rendered or expenses incurred after the Confirmation Date in connection with the Chapter 11 Case and the Plan including those relating to consummation of the Plan, any appeal of the Confirmation Order, the preparation, filing, and review of Professional Fee Claims, the prosecution of Avoidance Actions and Litigation Claims, and the resolution of Disputed Claims, will be paid by Reorganized RB on receipt of an invoice, or on other terms on which Reorganized RB and the Professional agree, without the need for further Bankruptcy Court authorization or entry of a Final Order.

**E.      Treatment of Classified Claims and Interests**

In accordance with Bankruptcy Code § 1123(a)(1), set forth below is a designation of classes of Claims against, and Equity Interests in, the Debtor (except the unclassified Claims receiving the treatment described in Section IV.D above). A Claim or Equity Interest is placed in a particular Class for the purpose of receiving distributions in accordance with the Plan only if that a Claim or Equity Interest has not been paid, released, or otherwise settled before the Effective Date. The treatment of classified Claims and Equity Interests and the provisions governing distributions on account of Allowed Claims and Allowed Equity Interests is set forth in Articles 3 and 4 of the Plan. You should refer to the Plan itself for the complete provisions governing the treatment of your particular Claim or Equity Interest.

1.      *Class 1 (Priority Claims)*

Class 1 consists of all Priority Claims other than Priority Tax Claims. Class 1 is unimpaired by the Plan. All holders of Allowed Priority Claims are deemed to have accepted the Plan and will not be solicited to vote on the Plan. Each holder of an Allowed Priority Claim other than a Priority Tax Claim will receive Cash in an amount equal to its Allowed Priority Claim on the later of: (i) the Effective Date, or as soon after that date as practicable; (ii) 30 days after the Priority Claim is Allowed; and (iii) when sufficient Cash becomes available from Reorganized RB's post-Effective Date receipts; unless, before the later of these three dates, the holder of the Claim and Reorganized RB agree in writing to a different date. The Chapter 11 Trustee does not believe there exist any significant Allowed Priority Claims.

2.    *Class 2 (General Unsecured Claims)*

Class 2 consists of all General Unsecured Claims, including all Participant Claims. Class 2 is impaired by the Plan. All holders of Allowed Unsecured Claims are entitled to vote and will be solicited to vote on the Plan. Except with respect to the Participant Claims of the RB Insiders, each holder of an Allowed Class 2 Claim will receive, in full and final satisfaction of its Allowed Class 2 Claim, Pro Rata payment from Reorganized RB's assets after payment of Allowed Administrative Claims and Allowed Priority Claims and operating expenses of Reorganized RB in accordance with the Reorganized RB Manager's discretion.

No holder of a Pass-Through Investment has a Claim against the Debtor or will receive any distribution under the Plan on account of that holder's Pass-Through Investment. If any holder of a Pass-Through Investment also is the holder of a Participant Claim, that holder will receive the treatment stated above solely on account of that Participant Claim and not on account of the Pass-Through Investment.

All Claims of all RB Insiders are Disputed Claims. As an accommodation to non-RB Insider Participants, the RB Insiders will be deemed to have voluntarily subordinated their Claims in Class 2, including any Participant Claims they hold, to all other Claims in Class 2. Accordingly, the RB Insiders will receive no distribution under the Plan on account of their Claims unless and until all other Allowed Claims in Class 2 are paid in full, with interest at the applicable legal rate, from the Petition Date through the date of final payment. If one or more RB Insiders objects to the treatment of its Claim under the Plan by filing a written objection by no later than the Bankruptcy Court-established deadline for objections to confirmation of the Plan, the Trustee reserves the right to commence an adversary proceeding seeking equitable subordination of that RB Insider's Claim under Bankruptcy Code § 510(c). Because their Claims are subordinated under the Plan, and because they are insiders of the Debtor, the RB Insiders are not entitled to vote to accept or reject the Plan.

The RB Insiders have advised the Chapter 11 Trustee that they do not consent to a subordination of their Claims in Class 2. Accordingly, the Trustee reserves the right to commence an adversary proceeding seeking equitable subordination of the RB Insiders' Claims under Bankruptcy Code § 510(c) owing to what the Trustee believes was inequitable and wrongful conduct by the RB Insiders that materially damaged the Participants before the Petition Date.

The Chapter 11 Trustee estimates that General Unsecured Claims total approximately $197 million.

3.    *Class 3 (Securities Claims)*

Class 3 consists of all Securities Claims. Class 3 is impaired by the Plan. All holders of Securities Claims are deemed to reject the Plan and will not be solicited to vote on the Plan.

Under Bankruptcy Code § 510(b), each Securities Claim is mandatorily subordinated to all other Claims. Accordingly, the holders of Securities Claims will not receive or retain any rights, property, or distributions on account of their Securities Claims under the Plan.

4.      *Class 4 (Equity Interests)*

Class 4 consists of all Equity Interests. Class 4 is impaired by the Plan. All holders of Equity Interests are deemed to reject the Plan and will not be solicited to vote on the Plan.

As of the Effective Date, all Equity Interests will not have any positive value based on the Effective Date balance sheet included in the Disclosure Statement. Although the holders of Equity Interests will nominally be the members of Reorganized RB, those membership interests are intended and expected to have negative value. Accordingly, the holders of Equity Interests will not receive or retain any rights, property, or distributions of any value on account of their Equity Interests under the Plan.

## V.      IMPLEMENTATION OF THE PLAN

### A.      Plan Funding

Funds needed to make Cash payments on and after the Effective Date on account of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims under the Plan (after taking into account agreements by holders of such Claims for post-Effective Date payments) will come from Cash on hand and from Cash Reorganized RB generates from its assets.

### B.      Reorganized RB

On the Effective Date, all assets of the Estate (including the Cash required for payments to be made under the Plan to certain holders of Allowed Administrative Claims, Allowed Priority Tax Claims, and Allowed Priority Claims) will vest in Reorganized RB.

1.      *Name.*

As of the Effective Date, Reorganized RB will be named "RB Liquidation, LLC."

2.      *Structure.*

The members of the Debtor immediately before the Effective Date will be the members of Reorganized RB from and after the Effective Date. Reorganized RB will be a manager-managed limited liability company under the laws of the State of Arizona, governed by the Reorganized RB Operating Agreement. The Reorganized RB Manager will exercise all authority for Reorganized RB and no member of Reorganized RB will be authorized to take any action or make any decision pertaining to the assets, financial affairs, or management of Reorganized RB. Without the specific written consent and authorization from the Reorganized RB Manager, Reorganized RB may not be dissolved, may not make an assignment for the benefit of creditors, may not voluntarily commence a bankruptcy proceeding, and may not consent to the entry of an order for relief under the Bankruptcy Code. No shareholder of Reorganized RB Manager will have any individual fiduciary or other duty to Reorganized RB or any Participant or any other Creditor by virtue of his status as a shareholder of Reorganized RB Manager.

3. *Reorganized RB Manager.*

As of the Effective Date, Reorganized RB Manager will be formed, with Visnu Patel as its President, and will begin serving as manager of Reorganized RB under the Reorganized RB Operating Agreement. Reorganized RB Manager:

        a.    will be governed in all respects by the Reorganized RB Operating Agreement;

        b.    may appoint, as necessary in the future, the individual to serve as a member of the board of ML Manager, LLC (an Arizona limited liability company), the board of which comprises five members, with one member being appointed by the Debtor or its successor;

        c.    must make distributions to Participants strictly in accordance with the Reorganized RB Operating Agreement and the Plan;

        d.    must use its reasonable best efforts to maximize the value and liquidate into Cash all Reorganized RB's non-Cash assets, make timely distributions to Participants, and not unduly prolong the existence of Reorganized RB, which must wind down and dissolve after liquidating all its assets and distributing all Cash proceeds of that liquidation in accordance with the Reorganized RB Operating Agreement;

        e.    will not be compensated;

        f.    must control and manage Reorganized RB's assets, including: (A) selling assets and collecting proceeds; (B) filing, prosecuting, and settling claim objections; (C) prosecuting and settling Avoidance Actions and Litigation Claims; and (D) making distributions to Participants and other Creditors in accordance with the Plan;

        g.    may retain any Professional deemed necessary in its discretion to assist in the administration of Claims and assets, prosecution of Avoidance Actions and Litigation Claims, and as otherwise needed to carry out Reorganized RB's business, with any such Professionals to be paid either from available Cash or on other terms to which Reorganized RB and the Professional agree;

        h.    subject to applicable law, will not be liable for any act or omission, except to the extent that the act or omission is determined by a court of competent jurisdiction to be the result of gross negligence, fraud, or willful misconduct. This limitation on liability applies equally to the agents, employees, and Professionals acting on Reorganized RB's behalf. No shareholder of Reorganized RB Manager will be personally liable with respect to any liabilities or obligations of the Debtor or Reorganized RB or any liabilities or obligations relating to Reorganized RB's assets. All Persons dealing with Reorganized RB will be required to look solely to Reorganized RB's assets for the enforcement of any claims against Reorganized RB.

4. *Purposes.*

Reorganized RB will operate, and its assets may be used, solely for the purposes of: (i) investigating, enforcing, abandoning, prosecuting, and resolving (by litigation, settlement, or otherwise) the Avoidance Actions, the Litigation Claims, and all Disputed Claims; (ii) collecting

on or liquidating all its non-Cash assets; (iii) distributing all Cash to the holders of Allowed Claims; and (iv) after all non-Cash assets are liquidated and all Cash is distributed, winding down and dissolving.

     5.    *Disputed Claims.*

Reorganized RB must manage distributions from proceeds of its assets so as to reserve sufficient Cash to make appropriate distribution on account of any Disputed Unsecured Claim as if that Disputed Unsecured Claim were an Allowed Unsecured Claim on the Effective Date in the Maximum Amount. If and when any Disputed Unsecured Claim becomes an Allowed Unsecured Claim, Cash proceeds of Reorganized RB's assets sufficient to make appropriate distribution to the holder that Claim will be made from such reserves. If a Disputed Unsecured Claim becomes a Disallowed Unsecured Claim, all reserved distributions attributable to the holder of that Disputed Unsecured Claim will become available for Pro Rata distribution to all holders of Allowed Unsecured Claims.

     6.    *Section 1145 Exemption.*

In accordance with Bankruptcy Code § 1145, the issuance under the Plan of the beneficial interests in Reorganized RB is exempt from the registration requirements of Section 5 of the Securities Act and any state or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker dealer in such securities and is deemed to be a public offer of such securities.

     7.    *Exchange Act Exemption.*

Because the membership interests in Reorganized RB are to be held by five individuals under the Plan and the Reorganized RB Operating Agreement, the Trustee intends, and Reorganized RB will make all reasonable efforts to ensure, that Reorganized RB is not required at any time to register under the Exchange Act or file periodic reports with the SEC.

     8.    *Restrictions.*

The membership interests in Reorganized RB may not at any time be sold for value, and may only be transferred to another Participant in accordance with the Reorganized RB Operating Agreement. At no time may the number of members in Reorganized RB exceed five.

## VI.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Contracts and Leases

All executory contracts and unexpired leases to which the Debtor is a party will be deemed rejected as of the Effective Date, except for any executory contract or unexpired lease that has been rejected in accordance with a Final Order entered on or before the Confirmation Date.

Entry of the Confirmation Order constitutes the approval under Bankruptcy Code § 365 of the rejection of the executory contracts and unexpired leases rejected under the Plan or otherwise during the Chapter 11 Case.

**B.      Rejection Damages Bar Date**

All Claims arising from the rejection of any executory contract or unexpired lease under the Plan are required to be filed with the Bankruptcy Court no later than 30 days after the Confirmation Date. Any such Claim not filed within that time will be forever barred. Any such Claim is a Class 2 Claim under the Plan. With respect to any executory contract or unexpired lease rejected by the Debtor before the Confirmation Date, the deadline for filing a Claim arising from the rejection remains the deadline set forth in the order of the Bankruptcy Court authorizing that rejection. If such an order did not contain such a deadline, the deadline for filing such a Claim is 30 days after the Confirmation Date.

**C.      Indemnification Obligations**

Any obligation of the Debtor to indemnify any Person serving as a fiduciary of any employee benefit plan or employee benefit program of the Debtor, under charter, by-laws, contract, or applicable state law is deemed to be an executory contract and rejected as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including but not limited to any officer or director of the Debtor, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtor related to any acts or omissions occurring before the Petition Date is rejected and canceled under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date). Any Claim resulting from these rejections in favor of any Person must be filed no later than 30 days after the Confirmation Date. Notwithstanding any of the foregoing, nothing contained in the Plan affects the rights of any Person covered by any applicable D&O Policy with respect to any such policy.

**D.      Obligations Pertaining to Pass-Through Investors**

Any obligation of the Debtor to provide services to a holder of a Pass-Through Investment as an agent, intermediary, designee, or other nominal representative of such holder is deemed to be an executory contract and rejected as of the Confirmation Date (but subject to the occurrence of the Effective Date). The Debtor will exert reasonable efforts to ensure that distributions from the Loan LLCs to the holders of Pass-Through Investments are made directly to those holders rather than to the Debtor.

## VII.    DESCRIPTION OF OTHER PROVISIONS OF THE PLAN

**A.      Vesting of Assets**

Except as provided in the Plan or the Confirmation Order, all property of the Estate will vest in Reorganized RB on the Effective Date free and clear of all Liens and Claims existing before the Effective Date. From and after the Effective Date, Reorganized RB may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code, including the employment of, and payment to, Professionals except as otherwise provided in the Plan or the

Confirmation Order. Any interest in any Pass-Through Investment nominally held in the Debtor's name is not property of the Estate and remains the property of the holder of the Pass-Through Investment as indicated on Exhibit C to the Plan.

**B.     Discharge**

Except as provided in the Plan or the Confirmation Order, the rights granted under the Plan and the treatment of Claims and Equity Interests under the Plan are in exchange for and in complete satisfaction, discharge, and release of, all Claims including any interest accrued on General Unsecured Claims from the Petition Date. Except as provided in the Plan or the Confirmation Order, confirmation of the Plan discharges the Debtor and Reorganized RB from all Claims or other debts that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code §§ 502(g), 502(h) or 502(i), whether or not: (a) a proof of claim based on such debt is filed or deemed filed under Bankruptcy Code § 501; (b) a Claim based on such debt is Allowed under Bankruptcy Code § 502; or (c) the holder of a Claim based on such debt has accepted the Plan. Without limiting the foregoing, the discharge granted under the Plan is granted to the fullest extent allowed under Bankruptcy Code §§ 1141(a), 1141(b), 1141(c), and 1141(d)(1).

**C.     Injunction**

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability that is unclassified by the Plan or that is classified by Article 3 of the Plan or that is subject to a distribution under the Plan, or an Equity Interest or other right of an equity security holder that is subject to a distribution under the Plan are permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, or Equity Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against any property to be distributed under the Plan; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any property to be distributed under the Plan; (c) creating, perfecting, or enforcing any Lien or encumbrance against any property to be distributed under the Plan; and (d) commencing or continuing any action, in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan or the Bankruptcy Code. Nothing in Section 10.02 or elsewhere in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of any holder of a Claim to assert a right to setoff or recoupment arising in connection with that Claim as part of the resolution and treatment of that Claim under the Plan. Nothing in Section 10.02 or elsewhere in the Plan is to be construed or is to have the effect of extinguishing, prohibiting, or otherwise limiting, the right of the Estate (through Reorganized RB as its representative or otherwise) or Reorganized RB to assert and prevail on any Avoidance Action or Litigation Claim. Nothing in Section 10.02 or elsewhere in the Plan enjoins or otherwise precludes (or may be construed to enjoin or otherwise preclude) any party in interest from enforcing the terms of the Plan and the Confirmation Order.

**D.  Exculpation**

None of the Debtor, the Trustee, Reorganized RB, any Committee, or any of their respective members, officers, directors, trustees, employees, advisors, professionals, or agents (other than those Persons identified as a possible defendant on Exhibit B to the Plan) have or will incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, the Trustee, Reorganized RB, any Committee, and each of their respective members, officers, directors, trustees, employees, advisors, professionals, and agents (other than those Persons identified as a possible defendant on Exhibit B to the Plan) are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

**E.  Avoidance Actions and Litigation Claims**

All Avoidance Actions and Litigation Claims are retained and reserved for Reorganized RB, which is designated as the Estate's representative under Bankruptcy Code § 1123(b)(3)(B) for purposes of the Avoidance Actions and Litigation Claims. Reorganized RB will have the authority to prosecute, defend, compromise, settle, and otherwise deal with any Avoidance Actions and Litigation Claims, and will do so in its capacity as a representative of the Estate in accordance with Bankruptcy Code § 1123(b)(3)(B). Reorganized RB will pay the fees and costs associated with litigating the Avoidance Actions and the Litigation Claims. The Chapter 11 Trustee anticipates that Reorganized RB will attempt, to the greatest extent possible, to use contingency fee counsel to pursue the Avoidance Actions and the Litigation Claims. Reorganized RB will have sole discretion to determine in its business judgment which Avoidance Actions and Litigation Claims to pursue, which to settle, and the terms and conditions of those settlements.

All Avoidance Actions held by the Estate against any Participant other than an RB Insider are settled and released as of the Effective Date. The Chapter 11 Trustee believes this settlement and release is in the overall best interests of all Participants. There may be an argument that certain transactions between Radical Bunny and its Participants may be preferences or fraudulent transfers. The Chapter 11 Trustee is generally aware of the parameters and possible effects of Avoidance Actions aimed at various Participants. The Chapter 11 Trustee also understands, however, that there will be defenses to such Avoidance Actions and other complications such as the fact that many Participants did not receive cash in these transactions but, rather, reinvested amounts into further investments. Trying to thoroughly account for all transactions that may provide a basis for Avoidance Actions against perhaps hundreds of Participants would, in the Chapter 11 Trustee's business judgment, be exceedingly expensive, time consuming, confusing, and muddled. The benefits would be uncertain at best and the costs would be substantial. The Chapter 11 Trustee weighed the advantages and disadvantages of pursuing or releasing these Avoidance Actions and believes, in his best business judgment, that pursuing Avoidance Actions of this nature would be needlessly expensive without sufficient benefit to the Participants in general. Accordingly, the Plan proposes to settle and release all Avoidance Actions against all Participants other than the RB Insiders. All Avoidance Actions or Litigation Claims against an RB Insider are retained and reserved for Reorganized RB.

**F.      Retention of Jurisdiction After the Effective Date**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain as much jurisdiction over the Chapter 11 Cases after the Effective Date as legally permissible including jurisdiction to:

a.      Allow, disallow, determine, liquidate, classify, estimate, or establish the amount, priority, or secured or unsecured status of any Claim, and resolve any request for payment of any Administrative Claim and any objection to the Allowance or priority of any Claim;

b.      Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan;

c.      Resolve any matters related to the rejection of any executory contract or unexpired lease to which the Debtor is a party and to hear, determine and, if necessary, liquidate any Claims arising from rejection;

d.      Ensure that distributions required under the Plan are accomplished in accordance with the Plan;

e.      Decide or resolve any motions, adversary proceedings, contested matters, and any other matters and grant or deny any applications or motions involving the Debtor that may be pending on the Effective Date;

f.      Enter any necessary or appropriate orders to implement or consummate the Plan's provisions and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

g.      Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of the Plan, or any Person's obligations incurred in connection with the Plan;

h.      Hear and determine any motion or application to modify the Plan before or after the Effective Date under Bankruptcy Code § 1127 or modify the Disclosure Statement or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement; or hear or determine any motion or application to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan or the Disclosure Statement, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

i.      Issue injunctions, enter and implement other orders, or take any other necessary or appropriate actions to restrain any entity's interference with consummation or enforcement of the Plan;

j.     Enter and implement any necessary or appropriate orders if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

k.     Determine any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document issued, entered into, filed, or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

l.     Issue a final decree and enter an order closing the Chapter 11 Case; and

m.     Adjudicate the Disputed Claims, the Avoidance Actions, and the Litigation Claims and any other cause of action or claims of the Estate.

## VIII.   ACCEPTANCE AND CONFIRMATION OF THE PLAN

### A.     Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of impaired Claims and Equity Interests accept the Plan, except under certain circumstances. Bankruptcy Code § 1126(c) defines acceptance of a plan by a class of impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Under Bankruptcy Code § 1126(d), a Class of Equity Interests has accepted the Plan if holders of such Equity Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Bankruptcy Code § 1126(f) deems a Class of Claims or Equity Interests to have accepted the Plan without voting if that Class is unimpaired under the definition in Bankruptcy Code § 1124. Class 1 under the Plan is unimpaired and, therefore, is deemed to accept the Plan. Class 2 is impaired under the Plan and, therefore, will be solicited to vote on the Plan. Classes 3 and 4 under the Plan are impaired but will receive or retain no property under the Plan and, therefore, are deemed to reject the Plan without voting.

### B.     Feasibility of the Plan

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor. This requirement is imposed by Bankruptcy Code § 1129(a)(11) and is referred to as the "feasibility" requirement. The Chapter 11 Trustee believes that it or Reorganized RB will be able to perform timely all obligations described in the Plan and, therefore, that the Plan is feasible.

To demonstrate the feasibility of the Plan, the Chapter 11 Trustee refers to the Effective Date Balance Sheet and Projections included in **Appendix 4**. These documents demonstrate that, although Reorganized RB will not have sufficient Cash on hand as of the Effective Date to make, on the Effective Date, all payments on account of all Administrative Claims and Priority Claims, sufficient Cash will be available at relevant times in the future to satisfy all obligations under the Plan to all Creditors in all Classes, including all Allowed Administrative Claims and Priority Claims. The Projections are based on a business model for Reorganized RB that relies solely on the maintenance and ultimate liquidation of Reorganized RB's assets, including its interests in

the ML Trust, its interests in the Loan LLCs, and the various Litigation Claims and Avoidance Actions it retains from the Debtor's Estate.

Accordingly, the Chapter 11 Trustee believes that the Plan satisfies the feasibility requirement of Bankruptcy Code § 1129(a)(11). The Chapter 11 Trustee cautions that no representations can be made as to the accuracy of the Effective Date Balance Sheet or as to Reorganized RB's ability to achieve the projected results. Certain of the assumptions on which the Effective Date Balance Sheet are based are subject to uncertainties outside the Trustee's control. Some assumptions inevitably will not materialize, and events and circumstances occurring after the date on which the Effective Date Balance Sheet was prepared may be different from those assumed or may be unanticipated, and may adversely affect Reorganized RB's financial results. Therefore, the actual results can be expected to vary from the projected results and the variations may be material and adverse.

The Effective Date Balance Sheet was not prepared with a view toward compliance with the guidelines established by the American Institute of Certified Public Accountants, the practices recognized to be in accordance with generally accepted accounting principles, or the rules and regulations of the Securities and Exchange Commission regarding projections. Furthermore, the Effective Date Balance Sheet has not been audited by independent accountants. Although presented with numerical specificity, the Effective Date Balance Sheet is based on a variety of assumptions, some of which in the past have not been achieved and which may not be realized in the future, and are subject to significant business, economic and competitive uncertainties and contingencies, and many of which are beyond any party's control. Consequently, the Effective Date Balance Sheet should not be regarded as a representation or warranty by the any Person, that projections will be realized. Actual results may vary materially from those presented.

## C.     Best Interests Test

### 1.     *Explanation*

Even if a plan is accepted by each class of claim holders, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of claims and interests that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(7), requires a bankruptcy court to find either that: (i) all members of an impaired class of claims or interests have accepted the plan; or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor was liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to members of each impaired class of holders of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by: (1) the claims of any secured creditors to the extent of the value of their collateral; and (2) the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case. Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a Chapter 7 trustee, as well as of counsel and other professionals retained by the Chapter 7 trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor or the Chapter 11 Trustee in the bankruptcy case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, litigation costs, and claims arising from the operations of the debtor during the pendency of the bankruptcy case. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity interests.

Once the court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If the probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

2.      *Application of the Liquidation Analysis*

A liquidation analysis prepared with respect to the Debtor is attached as **Appendix 5** to this Disclosure Statement. The Chapter 11 Trustee believes that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims that will ultimately become Allowed Claims. In preparing the liquidation analysis, the Chapter 11 Trustee has projected the amount of Allowed Claims based on a review of the Schedules, the Debtor's books and records, and filed proofs of claim. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims and Allowed Interests under the Plan.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Chapter 11 Trustee believes that, taking into account the liquidation analysis, the Plan meets the "best interests" test of Bankruptcy Code § 1129(a)(7). The Chapter 11 Trustee believes that each member of each Class will receive at least as much under the Plan as it would in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because avoiding the additional costs and delay of a Chapter 7 trustee and his new set of professionals, including statutory fees owing to the Chapter 7 trustee, will allow the realization of more value for Creditors.

**D.      Confirmation Over the Dissent of Non-Approving Classes**

If the Plan is not accepted by all impaired Classes of Allowed Claims, the Plan may still be confirmed by the Bankruptcy Court under Bankruptcy Code § 1129(b) if: (a) the Plan has been accepted by at least one Impaired Class of Claims and (b) the Bankruptcy Court determines, among other things, that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class (the "*Cramdown Provisions*"). If the Plan is not accepted by all impaired Classes of Allowed Claims or Equity Interests, the Debtor reserves the right to ask the Bankruptcy Court to confirm the Plan under the Cramdown Provisions.

The condition that a plan be "fair and equitable" with respect to a rejecting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a rejecting class of unsecured claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a rejecting class of interests includes the requirements that either (a) the plan provides that each holder of an interest in such class receive or retain under the plan, on account of such interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such interest, or (b) if the class does not receive such amount, no class of interests junior to the rejecting class will receive a distribution under the plan.

**IX.      CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

**A.      Introduction**

A summary description of certain United States federal income tax consequences ("**Tax Consequences**") of the Plan follows. This description is for informational purposes only and, owing to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various Tax Consequences of the Plan discussed below. This disclosure describes only the principal Tax Consequences of the Plan to the Debtor and to holders of Claims and Equity Interests. No opinion of counsel has been sought or obtained with respect to any Tax Consequences of the Plan. No rulings or determinations of the IRS or any other tax authorities have been sought or obtained with respect to any Tax Consequences of the Plan, and the discussion below is not binding on the IRS or other authorities. No representations are being made to the Debtor or any holder of a Claim or Equity Interest regarding the particular

Tax Consequences of the confirmation and consummation of the Plan. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed here.

The following discussion of the Tax Consequences is based on the Internal Revenue Code of 1986, as amended, (the "**Code**") Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the Tax Consequences of the Plan to special classes of taxpayers (*e.g.,* banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees of the Debtor, persons who received their Claims by exercising an employee stock option or otherwise as compensation, and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

Holders of Claims and Equity Interests are strongly urged to consult their own tax advisor regarding the United States federal, state, local, and foreign tax consequences of the transactions described in this Disclosure Statement and in the Plan.

**B.      United States Federal Income Tax Consequences to the Debtor**

The Debtor is a limited liability company taxed as a partnership for United States federal income tax purposes ("**Tax Purposes**"). A partnership is not a taxable entity, rather any gains, losses or other items of income or deductions or credit realized by the Debtor ("**Tax Items**") will be passed through to the holders of Equity Interests. The fact that the Debtor is subject to a Chapter 11 proceeding will not change this result. Thus, the Chapter 11 bankruptcy proceeding has no impact on the Tax Consequences of the transactions contemplated by the Plan.

**C.      Federal Income Tax Consequences to Creditors**

The following discusses certain Tax Consequences of the transactions contemplated by the Plan to Creditors that are "United States holders," as defined below. The Tax Consequences of the transactions contemplated by the Plan to Creditors (including the character, timing and amount of income, gain or loss recognized) will depend on, among other things: (1) whether the Claim and the consideration received in respect of it are "securities" for Tax Purposes; (2) the manner in which a Creditor acquired a Claim; (3) the length of time the Claim has been held; (4) whether the Claim was acquired at a discount; (5) whether the Creditor has taken a bad debt deduction with respect to the Claim (or any portion of it) in the current tax year or any prior tax year; (6) whether the Creditor has previously included in its taxable income accrued but unpaid interest with respect to the Claim; (7) the holder's method of tax accounting; and (8) whether the Claim is an installment obligation for Tax Purposes. Creditors, therefore, should consult their

own tax advisors regarding the particular Tax Consequences to them of the transactions contemplated by the Plan.

For purposes of the following discussion, a "United States holder" is a Creditor that is: (1) a citizen or individual resident of the United States; (2) a partnership, limited liability company, or corporation created or organized in the United States or under the laws of the United States, a political subdivision of the United States, or a State of the United States; (3) an estate whose income is subject to United States federal income taxation regardless of its source; or (4) a trust if (i) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States fiduciaries have the authority to control all substantial decisions of the trust, or (ii) the trust was in existence on August 20, 1996, and properly elected to be treated as a United States person.

1.    *Characterization* of Claims

Under the Plan, Creditors will receive Cash in exchange for the full and final satisfaction of their Claims. The Tax Consequences of such exchange could differ depending on whether the initial advance made by the Creditors leading to the Creditors' Claims was properly treated at the time of the initial advance as debt, rather than equity, for Tax Purposes.

Historically, the Debtor treated the initial advances made by the Creditors as debt. The IRS may not, however, agree with the debt classification of such advances and could classify the initial advances as an equity investment in the Debtor by the Creditors.

Whether an advance to a partnership is treated as debt or equity is primarily focused at ascertaining the intent of the parties. However, the parties classification of an advance as debt or equity is not dispositive and such classification can, depending on the circumstances, be re-characterized. No one factor is determinative as to whether an advance constitutes debt or equity. The courts look to the following factors when making such determination: (1) whether the promise to repay was evidenced by a note or other instrument; (2) whether interest was charged; (3) whether a fixed schedule for repayments was established; (4) whether collateral was given to secure payment; (5) whether repayments were made; (6) whether the borrower had a reasonable prospect of repaying the loan and whether the lender had sufficient funds to advance the loan; and (7) whether the parties conducted themselves as if the transaction were a loan.

a.    *Equity*

If the Creditors' initial advances are treated as an equity investment in the Debtor, the Creditors would be treated as "partners" of the Debtor for Tax Purposes and would be subject to similar Tax Consequences as the holders of Equity Interests. That is, such Creditors would be allocated a portion of the Debtor's Tax Items, which would include an allocation of a proportionate share of the Debtor's COD income.

A Creditor who is treated as having exchanged its Claim, characterized as equity for Tax Purposes, for Cash will generally recognize gain or loss in an amount equal to the difference between the amount of Cash received and the Creditor's adjusted tax basis in such Claim, as adjusted for allocations from the Debtor of Tax Items. See Section D.1.c., below, for discussion regarding the character of the Creditor's gain or loss.

###### b. *Debt*

If the Creditors initial advances are treated as debt, the Tax Consequences would depend primarily on whether the Creditors are deemed to have "disposed" of their debt under the Terms of the Plan within the meaning of Code Section 1001. Under Code Section 1001, a disposition will be deemed to have occurred where a debt instrument is significantly modified either in kind or in extent from the old instrument. No one factor is determinative as to whether a debt instrument has been significantly modified. The courts look to the following factors: (1) change in interest rate; (2) change in maturity date; (3) change of security; or (4) change of type of instrument.

A Creditor who is treated as having significantly modified the terms of a debt instrument would be treated as having exchanged an original debt instrument for a modified new debt instrument, and would recognize gain or loss in an amount, generally speaking, which is equal to the difference between the Creditor's adjusted tax basis in the original debt instrument and the issue price of the modified new debt instrument as determined under Treasury Regulations Section 1.1273-2 or 1.1274-2. See Section D.1.c., below, for discussion regarding the character of the Creditor's gain or loss.

Alternatively, a Creditor who is treated as disposing of its Claim, characterized as debt for Tax Purposes, for Cash would generally recognize gain or loss in an amount equal to the difference between the amount of Cash received and the Creditor's adjusted tax basis in such Claim. See Section D.1.c., below, for discussion regarding the character of the Creditor's gain or loss.

###### c. *Character of the Creditor's Gain or Loss*

The character of a Creditor's gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors which vary depending on a Creditor's particular circumstances. Such factors include the nature of such Claim as held by the Creditor, whether such Claim constitutes a capital asset in the hands of the Creditor, whether such Claim was purchased at a discount, whether any amount received in respect of such Claim constitutes accrued interest, and whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to such Claim. A Creditor who recognizes a loss on a transaction conducted under the Plan may be entitled to a bad debt deduction, either in the taxable year of the Effective Date or a prior taxable year.

##### 2. *Accrued Interest*

Holders of Claims for accrued interest that previously have not included such accrued interest in taxable income will be required to recognize ordinary income equal to the amount of Cash received under the Plan with respect to such Claims for accrued interest. Holders of Claims for accrued interest that have included such accrued interest in taxable income generally may take an ordinary deduction to the extent that such Claim is not fully satisfied under the Plan (after allocating the distribution between principal and accrued interest), even if the underlying Claim is held as a capital asset. The adjusted tax basis of any Cash received in exchange for a Claim for accrued interest will equal the amount of Cash on the Effective Date, and the holding

period for the property will begin on the day after the Effective Date. It is not clear the extent to which consideration that may be distributed under the Plan will be allocable to interest. Creditors are advised to consult their own tax advisors to determine the amount, if any, of consideration received under the Plan that is allocable to interest.

3.  *Market Discount*

In general, a debt obligation, other than one with a fixed maturity of one year or less, that is acquired by a holder in the secondary market (or, in certain circumstances, on original issuance) is a "market discount bond" as to that holder if the obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, the revised issue price) exceeds the holder's adjusted tax basis in the debt obligation immediately after its acquisition. However, a debt obligation will not be a "market discount bond" if such excess is less than a statutory *de minimis* amount. To the extent that a Creditor has not previously included market discount in its taxable income, gain recognized by a Creditor on the disposition of a "market discount bond" will generally be treated as ordinary interest income to the extent of the market discount accrued on such bond during the Creditor's period of ownership. A holder of a market discount bond that is required to defer deduction of all or a portion of the interest on indebtedness incurred or maintained to acquire or carry the bond may be allowed to deduct such interest, in whole or in part, on the disposition of such bond. In addition, any partial principal payment received by a Creditor that is attributable to a market discount bond will generally be treated as ordinary interest income to the extent such payment does not exceed the market discount accrued on such bond during the Creditor's period of ownership.

4.  *Original Issue Discount*

The original issue discount ("**OID**") rules provide an extremely detailed and complex method for determining and taxing the interest components of debt instruments. A holder of a debt instrument containing OID must include a portion of the OID in gross income in each taxable year in which the holder holds the debt instrument, regardless of whether any cash payments are received. OID is defined as the difference between the issue price and the stated redemption price at maturity of a debt instrument. As the OID rules are extremely complex, it is not certain how they will apply to the transactions contemplated by the Plan. Accordingly, each Creditor must consult its own tax advisor.

5.  *Other Claimholders*

If a Creditor reaches an agreement with the Chapter 11 Trustee or Reorganized RB to have its Claim satisfied, settled, released, exchanged, or otherwise discharged in a manner other than as described in the Plan, that Creditor should consult with its own tax advisors regarding the Tax Consequences of that satisfaction, settlement, release, exchange, or discharge.

6.  *Information Reporting and Backup Withholding*

Certain payments, including payments in respect of accrued interest or market discount, are generally subject to information reporting by the payor to the IRS. These reportable payments do not include those that give rise to gain or loss on the exchange of a Claim. Moreover, such reportable payments are subject to backup withholding under certain

circumstances. A United States holder may be subject to backup withholding at rate of 28 percent with respect to certain distributions or payments of accrued interest, market discount, or similar items pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct, and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Payments that give rise to gain or loss on the exchange of a Claim are not subject to backup withholding.

Backup withholding is not an additional tax. Amounts subject to backup withholding are credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess backup withholding by filing an appropriate claim for refund with the IRS.

**D.     Tax Consequences to the Holders of Equity Interests**

    1.    *Cancellation of Indebtedness ("**COD**") Income*

Under the Plan, the Debtor's outstanding indebtedness will be satisfied in exchange for Cash. The satisfaction of a debt obligation for an amount of cash less than the "adjusted issue price" of the debt obligation generally gives rise to cancellation of indebtedness ("COD") income to the Debtor. Because the Debtor's outstanding indebtedness will be satisfied in exchange for Cash, the amount of COD income may be significant. As stated above, because the Debtor is a partnership for Tax Purposes, such COD income will be allocated to the holders of Equity Interests.

Under Code Section 108, a debtor does not generally recognize COD income if the debt is discharged in a Title 11 bankruptcy case. However, in the case of a partnership, like the Debtor, and its partner/members, the relevant exception to the recognition of such income applies at the partner/member level, not the partnership level. Accordingly, the Tax Consequences of the COD income allocated to the holders of the Equity Interests will depend upon the individual circumstances of each holder of the Equity Interests. If a holder of an Equity Interest is not in its own Title 11 bankruptcy case or insolvent (to the extent of its allocable share of the COD income) at the time such COD income is realized by the Debtor, the particular holder of an Equity Interest will be required to report its allocable share of COD income as ordinary income. In such an event, it should be noted that to the extent such holder has offsetting capital losses (losses realized from the sale or exchange of capital assets) from this or any other transaction that can be claimed, such capital losses can only offset up to $3,000 of ordinary income such as the COD income discussed above. Please note, however, COD income does not arise if the payment would give rise to a deduction (potentially the case if the payment is for interest or accrued interest).

    2.    *Potential Income as a Result of Pass Through Investments*

Under certain circumstances, the Debtor could potentially recognize gain or COD income if the Plan's treatment of the Pass-Through Investments is characterized as a distribution of a property right to the holders of the Pass-Through Investments, and such gain or COD income would be allocated to the holders of the Equity Interests. See Section E for additional discussion.

3.    *Minimum Gain Chargeback*

In the absence of a guarantee (or similar arrangement between a holder of an Equity Interest and a Creditor subjecting such holder to liability), the holders of the Equity Interests are not liable for the debts of the Debtor. The portions of the Claims by the Creditors for which no holder of an Equity Interest is liable will be referred to herein as "**Nonrecourse Debts**" and those portions for which one or more holders of Equity Interests are liable will be referred to as "**Partner Nonrecourse Debts**". If any deductions ("**Nonrecourse Deductions**") previously allocated to a particular holder of an Equity Interest were attributable to a Nonrecourse Debt (*i.e.*, generated an increase in the Debtor's minimum gain, as such term is used in Regulations § 1.704-2(d)), an equivalent portion of COD income will have to be allocated to such holder of the Equity Interest. In other words, the discharge of the Nonrecourse Debts will generate a decrease in the Debtor's minimum gain, and thus, the COD income will have to be allocated among the holders of the Equity Interests in proportion to their respective shares of such decrease. Similarly, if any deductions ("**Partner Nonrecourse Deductions**") previously allocated to a holder of an Equity Interest were attributable to a Partner Nonrecourse Debt (*i.e.*, generated an increase in the Debtor's minimum gain, as such term is used in Regulations § 1.704-2(i)), an equivalent portion of COD income will have to be allocated to the recipient. In other words, the discharge of the Partner Nonrecourse Debts will generate a decrease in the Debtor's partner minimum gain, and thus, the COD income will have to be allocated among the holders of the Equity Interests in proportion to their respective shares of such decrease. If the Debtor's COD income is less than the sum of the Nonrecourse and Partner Nonrecourse Deductions previously allocated, other items of income and gain will have to be allocated among the holders of the Equity Interests in proportion to their respective remaining shares of the decrease in minimum gain and partner minimum gain. Likewise, to the extent the COD income exceeds the decrease in minimum gain and partner minimum gain, the excess will (unless COD income is specially allocated) be allocated in the same manner as other income is allocated under the Debtor's partnership/operating agreement to the extent drafted consistent with the Code Section 704(b) Regulations. Generally speaking, each holder of an Equity Interest's share of the decrease in minimum gain and/or partner minimum gain should be equal to the negative balance in such holder's capital account.

Please note, however, that the Chapter 11 Trustee has not analyzed previous allocations made by the Debtor and are not addressing the Tax Consequences to the individual holders of the Equity Interests as a result of the Debtor's historical allocations of Nonrecourse Deductions or Partner Nonrecourse Deductions.

4.    *Deemed Distributions*

A partner's tax basis in its partnership interest will include his share of partnership debt. Pursuant to the Regulations § 752-3(a), a partner's share of partnership nonrecourse debt will equal (i) the partner's share of partnership minimum gain, (ii) the amount of any taxable gain that would be allocated to the partner pursuant to section 704(c) of the Internal Revenue Code or in the same manner as under section 704(c) upon the disposition of partnership property and (iii) the partner's proportionate share of any nonrecourse liabilities not allocable to the partners under (i) or (ii) above. The share of nonrecourse liabilities allocated to a partner under (iii) above is based upon his percentage interest in partnership profits as specified in the partnership

agreement. A partner's basis also includes a portion of any Partner Nonrecourse Debt in proportion to the amount for which the partner bears the economic risk of loss with respect to the debt.

To the extent a partners share of partnership debt is reduced, a deemed distribution will occur. If the deemed distribution exceeds the partner's tax basis in his partnership interest, such excess will be recognized as gain. Because of the foregoing Tax Consequences, it is important to determine each holder of an Equity Interest's interest in the profits of the Debtor. The cancellation of the Nonrecourse Debt will result in a deemed distribution to the holders of the Equity Interests. Each holder's basis in its Equity Interest will, however, be increased by the COD income and other items of income and gain allocated to it. As a result, each holder of an Equity Interest may not be taxed on the deemed cash distributions resulting from the decrease in its share of partnership liabilities. The IRS may not, however, agree with the manner in which either the debt is shared or the COD income (or other items of income and gain) is allocated among the holders of the Equity Interests, and, if the IRS prevails with respect to a challenge of the Debtor's position, a holder of an Equity Interest may recognize more gain as a result of the deemed distribution.

**E.      Tax Consequences as a Result of Pass-Through Investments**

Pursuant to the Plan, no holder of a Pass-Through Investment has a Claim against the Debtor or will receive any distribution under the Plan on account of that holder's Pass-Through Investment. Holders of Pass-Through Investments are treated under the Plan as the owner of certain investments in which the Debtor is nominally identified as the holder (i.e. the Debtor is treated as the nominee and each such holder is treated as the nominor for each relevant investment). If such characterization is respected for Tax Purposes then each Pass-Through Investment will never have been treated as owned by the Debtor and thus there would be no Tax Consequences to the Debtors.

The IRS may, however, not agree with such characterization. In such an event, the Debtor would be deemed to have distributed a property right to the holders of the Pass-Through Investments. The Tax Consequences of such distribution could differ depending on whether the distributed property constituted debt or equity, and whether the initial advance made by the holders of the Pass-Through Investments constituted debt or equity in the Debtor. See Section D.1. for additional discussion regarding whether advances made to a partnership are treated as debt or equity for Tax Purposes.

1.      *Consequences to Debtor for Distributions to Holders of Pass-Through Investments Treated as Holding Debt in the Debtor*

If the holders of Pass-Through Investments are treated as holding debt in the Debtor, the Debtor would be treated as having satisfied its indebtedness in exchange for the fair market value of the distributed property. If the fair market value of the property right is less than the "adjusted issue price" of the debt obligation, the deemed distribution of property to the holders of Pass-Through Investments could give rise to COD income to the Debtor, which would be allocated to the holders of Equity Interests.

In addition, the Debtor would recognize gain or loss measured by the difference between the adjusted basis to the Debtor of the distributed property and the fair market value of such distributed property. The character of such gain or loss could be either capital gain or loss or ordinary gain or loss, and such gain or loss would be allocated to the holders of Equity Interests.

This does not address the Tax Consequences of such distribution to the holders of the Pass-Through Investments.

2.      *Consequences to Debtor for Distributions to Holders of Pass-Through Investments Treated as Holding Equity in the Debtor*

If the holders of Pass-Through Investments are treated as holding equity in the Debtor, the Debtor would be treated as having distributed a property right to a partner. Generally speaking, whether or not such property right is treated as debt or equity for Tax Purposes, the Debtor would not be subject to any Tax Consequences as the result such deemed distribution. However, under certain circumstances, distributions between a partnership and a partner can be deemed to constitute a sale or exchange of property between the partnership and the distributee partner. A distribution can be deemed to constitute a sale or exchange when a partner either receives Code Section 751 property in exchange for relinquishing any part of an interest in other partnership property, or receives other partnership property in exchange for relinquishing any part of the partner's interest in Code Section 751 property. Generally speaking, Code Section 751 property includes unrealized receivables and inventory which has substantially appreciated in value.

If a distribution of a property right to a holder of a Pass-Through Investment is deemed to constitute a sale or exchange, the Debtor would likely realize gain or loss. The amount of the gain would be measured by the difference between the adjusted basis to the Debtor of the distributed property deemed sold to the partner, and the fair market value of the distributee partner's interest in the property deemed to have been relinquished. The character of such gain or loss could be either capital gain or loss or ordinary income or loss. In computing the distributive share of the Debtor's gain or loss, the gain or loss would be allocated to the holders of Equity Interests. Please note, however, that a distribution of property to a partner, which previously contributed such property to the partnership, would not be treated as a deemed sale or exchange of property between the partnership and the distributee partner. This does not address the Tax Consequences of such distribution to the holders of the Pass-Through Investments.

**F.      Importance of Obtaining Professional Tax Assistance**

The foregoing discussion is intended only as a summary of certain United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The above discussion is for informational purposes only and is not tax advice. The tax consequences are in many cases uncertain and may vary depending on a Creditor's particular circumstances. Accordingly, Creditors are strongly urged to consult their tax advisors about the United States federal, state and local and applicable foreign income and other tax consequences of the Plan, including with respect to tax reporting and record keeping requirements.

**IRS Circular 230 Notice: To comply with U.S. treasury regulations, be advised that any U.S. federal tax advice included in this communication (and it is not intended that any such advice be given in this Disclosure Statement) is not intended or written to be used, and cannot be used, to avoid any U.S. federal tax penalties or to promote, market, or recommend to another party any transaction or matter.**

## X.  RISK FACTORS

### A.  Generally

The restructuring of the Debtor involves a degree of risk, and this Disclosure Statement and certain of its Exhibits contain forward-looking statements that involve risks and uncertainty. Reorganized RB's actual results could differ materially from those anticipated in such forward-looking statements as a result of a variety of factors, including those set forth in the following risk factors and elsewhere in this Disclosure Statement. **Holders of Claims should consider carefully the following factors in addition to the other information contained in this Disclosure Statement.**

*Key Personnel.* Reorganized RB's post-Effective Date operations depend to a great extent on the efforts of the Reorganized RB Manager and other key personnel, as well as the ML Manager board, and the board and liquidating trustee managing the ML Trust. There can be no assurance that Reorganized RB will be successful in attracting and retaining the most suitable individuals to serve on its board, that the ML Manager board will perform as well as hoped or expected, or that the ML Trust will be managed as well as hoped or expected. Underperformance by any of the management boards of Reorganized RB, the ML Trust, or the ML Manager will have a material adverse effect on the recoveries of Creditors from Reorganized RB.

*Claim Amount Estimates.* The estimated Claims set forth in the Disclosure Statement are based on various assumptions, and the actual amount of Allowed Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual amount of Allowed Claims may vary from the estimated Claims contained in the Disclosure Statement. Such differences may materially and adversely affect, among other things: (a) the percentage recoveries to Holders of Allowed Claims under the Plan; (b) Reorganized RB's ability to consummate the Plan; and (c) the Projections.

*Performance of Loan LLCs.* The vast majority of the funds that will be available to make distributions to Participants and other Creditors under the Plan are likely to come from the performance of the various Mortgages Ltd. loans now owned by the Loan LLCs in which Radical Bunny now has (and Reorganized RB will have) an interest. Many of the loans in the Loan LLCs are in monetary default and are secured by interests in real property of a value less than the face amounts owing under the loans. Certain loans in the Loan LLCs are owed by borrowers who are, themselves, in bankruptcy proceedings, further complicating recoveries under those loans for the Loan LLCs and, by extension, Reorganized RB. The results obtained in those borrower bankruptcies and other default situations will directly affect the recoveries to Creditors of Reorganized RB. Those results could be significantly worse than presently expected.

*Litigation Claims.* Reorganized RB will undertake to investigate and possibly pursue Litigation Claims against various parties. Realizing recoveries from those Litigation Claims depends on Reorganized RB's ability to obtain contingency fee-based counsel. Unless Reorganized RB is able to hire counsel on that basis, there is a substantial risk that no funds will be available to pay counsel and other professionals to investigate and pursue Litigation Claims. Additionally, some of the targets of the Litigation Claims may be partially or completely incapable of paying any judgments that may be obtained against them. For example, any claims asserted against Tom Hirsch may ultimately prove difficult to collect, considering the substantial legal challenges Tom Hirsch currently faces and is likely to face in the future in connection with his management of Radical Bunny before the Chapter 11 Case began.

## B.    Reorganization Factors

### 1.    *Financial Considerations*

As with any plan of reorganization or other financial transaction, there are certain risk factors that must be considered. All risk factors cannot be anticipated, some events will develop in ways that were not foreseen, and many or all of the assumptions that have been used in connection with this Disclosure Statement and the Plan will not be realized exactly as assumed. Some or all of such variations may be material. Although efforts have been made to be reasonable in this regard, there can be no assurance that subsequent events will bear out the analyses set forth in this Disclosure Statement. Holders of Claims and Equity Interests should be aware of some of the principal risks associated with the contemplated reorganization:

  a.    There is a risk that one or more of the required conditions or obligations under the Plan will not occur, be satisfied or waived, as the case may be, resulting in the inability to confirm the Plan.

  b.    The total amount of all Claims filed in the Chapter 11 Case may materially exceed the estimated amounts of Allowed Claims assumed in the development of the Plan and in the valuation estimates provided above. The actual amount of all Allowed Claims in any Class may differ significantly from the estimates provided in this Disclosure Statement. The amount and timing of the distributions that will ultimately be received by any particular holder of an Allowed Claim in any Class may be materially and adversely affected if the estimates are exceeded as to any Class.

c.          Uncertainties may adversely affect Reorganized RB's future operations including acts of God or similar circumstances. Many of these factors will be substantially beyond Reorganized RB's control, and a change in any factor or combination of factors could have a material adverse effect on Reorganized RB' financial condition, cash flows, and results.

2.    *Risk of Non-Confirmation of the Plan*

Although the Chapter 11 Trustee believes that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can also be no assurance that modifications of the Plan will not be required for Confirmation, that such negotiations would not adversely affect the holders of Allowed Claims and Equity Interests, or that such modifications would not necessitate solicitation or re-solicitation of votes.

## XI.    ALTERNATIVES TO THE PLAN

The Chapter 11 Trustee believes that the Plan affords holders of Claims the greatest realization on the Debtor's assets and, therefore, is in the best interests of Creditors. But if the Plan is not confirmed, the theoretical alternatives include: (a) continuation of the pending Chapter 11 Case without any immediately available financing; (b) an alternative plan or plans of reorganization; or (c) liquidation of the Debtor under Chapter 7 of the Bankruptcy Code.

**A.    Continuation of the Chapter 11 Case**

Because the Debtor's financial affairs are not likely to change in any material respect, continuing the Chapter 11 Case would only increase the amount of Administrative Claims against the Estate without any corresponding ability to pay those Administrative Claims. Since the Plan provides a means of satisfying all Claims with Cash, continuing the Chapter 11 Case would serve no purpose other than increasing costs to the Estate and reducing recoveries to holders of Class 2 General Unsecured Claims.

**B.    Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtor, any party in interest in the Chapter 11 Case could propose a different plan or plans. Those plans might involve either a reorganization and continuation of the Debtor's business, or some other form of orderly liquidation of the Debtor's assets, or a combination of both.

**C.    Liquidation Under Chapter 7**

If no plan is confirmed, the Debtor's Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. In a Chapter 7 case, a trustee or trustees would be appointed to liquidate the assets of the Debtor. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtor or how that would differ materially from what the Plan provides. The Chapter 11 Trustee believes, however, that holders of Claims would lose substantial value if the Debtor were

forced to liquidate under Chapter 7 because the additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist those trustees would cause a substantial diminution in the value of the Estate. The assets available for distribution to holders of Claims would be reduced by those additional expenses.

## XII.    CONCLUSION

### A.    Hearing on and Objections to Confirmation

1.    *Confirmation Hearing*

The hearing on confirmation of the Plan has been scheduled for January ____, 2010 at _____ __.m. (Arizona time). The hearing may be adjourned from time to time by announcing the adjournment in open court, all without further notice to parties in interest, and the Plan may be modified under Bankruptcy Code § 1127 before, during, or as a result of that hearing, without further notice to parties in interest.

2.    *Deadline for Objections to Confirmation*

The time by which any objections to confirmation of the Plan must be filed with the Bankruptcy Court and received by the parties listed in the Confirmation Hearing Notice has been set for January 4, 2010 at 5:00 p.m. (Arizona time).

### B.    Recommendation

The Plan provides for the best possible and most equitable distribution to Creditors. The Chapter 11 Trustee believes that any alternative to confirmation of the Plan, such as Chapter 7 liquidation or attempts by another party in interest to file a plan, would result in significant delays, litigation, and additional costs with no corresponding benefit. For these reasons, the Chapter 11 Trustee urges you to vote to accept the Plan and to support Confirmation of the Plan.

Dated: December 1, 2009                Respectfully submitted,

**SQUIRE, SANDERS & DEMPSEY L.L.P.**        **G. GRANT LYON,**
                                            Chapter 11 Trustee

By: ___*/s/ Jordan A. Kroop*_____
        Thomas J. Salerno                _____*/s/ G. Grant Lyon*_____
        Jordan A. Kroop

**Appendix 1**

**Plan of Reorganization**

**Appendix 2**

**Order Approving Disclosure Statement**

**Appendix 3**

**Radical Bunny Interests in Loan LLCs**

**Appendix 4**

**Selected Financial Information**

**Appendix 5**

**Liquidation Analysis**

PHOENIX/504760.5