Thomas J. Salerno (AZ Bar No. 007492) tsalerno@ssd.com
Jordan A. Kroop (AZ Bar No. 018825) jkroop@ssd.com
SQUIRE, SANDERS & DEMPSEY L.L.P.
Two Renaissance Square
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004-4498
Telephone: (602) 528-4000

Counsel for the Chapter 11 Trustee

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>RADICAL BUNNY, LLC,<br><br>                     Debtor. | Chapter 11<br>Case No. 2:08-bk-13884-CGC<br><br>**NOTICE OF FILING EXHIBIT A TO PLAN OF REORGANIZATION** |

G. Grant Lyon, the Chapter 11 Trustee for Radical Bunny, LLC, files the attached draft operating agreement for Reorganized RB (as defined in the *Plan of Reorganization* filed in this case [DE #666] (the "**Plan**")), which is Exhibit A to the Plan. This draft operating agreement remains subject to change one or more times before confirmation of the Plan and the Effective Date of the Plan.

        Dated December 1, 2009

                          **SQUIRE, SANDERS & DEMPSEY L.L.P.**

                          By:     */s/ Jordan A. Kroop*
                                   Thomas J. Salerno
                                   Jordan A. Kroop
                          Two Renaissance Square
                          40 North Central Avenue, Suite 2700
                          Phoenix, Arizona 85004-4498
                          (602) 528-4000

                          Counsel for the Chapter 11 Trustee

**Appendix A**

**Reorganized RB Operating Agreement**

**OPERATING AGREEMENT**


**OF**


**RB LIQUIDATION, L.L.C.**

**f/k/a RADICAL BUNNY, L.L.C.**


This Operating Agreement ("Agreement") is entered into as of **[Insert Effective Date of the Plan]**, 2009 (the "Effective Date"), between the Persons enumerated on Schedule C, attached hereto, as the Members, and RB Liquidation Manager, Corp., as the Manager of RB Liquidation, L.L.C., an Arizona limited liability company (the "Company").

Radical Bunny, L.L.C., an Arizona limited liability company, a debtor in a Chapter 11 Case (the "Debtor"), proposed a Plan (as defined herein) for the resolution of its outstanding claims. As of the Effective Date, the Debtor shall become reorganized and will change its name to the name of the Company. A copy of the Plan has been included with this Agreement as Schedule A.

The members of the Debtor immediately before the Effective Date will be the Members of the Company from and after the Effective Date. Any gains, losses or other items of income or deductions realized by the Debtor and passed through to its Members will be the same as if no bankruptcy proceeding had been filed.

Following the Effective Date, the Members hereto desire to continue the Company under the Act (as defined herein) and pursuant to the Plan (as defined herein), to operate the Company for the purposes and on the terms and conditions set forth in this Agreement (as defined herein), and to appoint the Manager to manage the Company as provided herein.

Now, therefore, in consideration of the premises and mutual covenants and obligations hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree to adopt this operating agreement of as follows:

**SECTION 1.** DEFINITIONS; THE COMPANY

1.1    Definitions. Capitalized words and phrases used in this Agreement shall have the meanings set forth in Section 11.13 hereof.

1.2    Name. The name of the Company is RB Liquidation, L.L.C. The name of the Company may be changed by the Manager upon written notice to all Members.

1.3    Formation.

1.3.1    The Company shall be operated as a limited liability company pursuant to the provisions of the Act and this Agreement.  The Company shall cause the execution, delivery and filing of an amended and restated Articles of Organization and any other certificates, notices, statements or other instruments (and any amendments or restatements thereof) necessary or appropriate for the continuation of the Company and the operation of the Company in all jurisdictions where the Company reasonably expects to do business.

1.3.2    The Bankruptcy Court on the Effective Date shall approve at confirmation of the Plan the Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Professional Fee Claims, Allowed Participant Claims and General Unsecured Claims that will receive payments of Excess Cash from the Company's post-Effective Date receipts (individually a "Company Creditor" collectively, the "Company Creditors").  The Company Creditors and the amount of each Company Creditor's Claim shall be set forth on Schedule B.

1.3.3    The Manager shall update Schedule B and the Company's books and records from time to time as necessary to reflect all payments remitted to Company Creditors. The Manager shall also update Schedule B and the Company's books and records from time to time to reflect the change in mailing address, facsimile number or e-mail address for any Company Creditor that sends written notice of such to the Company.  Any amendment or revision to Schedule B made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to Schedule B shall be deemed to be a reference to Schedule B as amended and in effect from time to time.

1.4    Purposes.  The Company will operate, and its assets may be used, solely for the purposes of: (i) investigating, enforcing, abandoning, prosecuting, and resolving (by litigation, settlement, or otherwise) the Avoidance Actions, the Litigation Claims, and all Disputed Claims; (ii) collecting on or liquidating all its non-Cash assets; (iii) remitting all Cash to the Company Creditors; and (iv) after all non-Cash assets are liquidated and all Cash is distributed, winding down and dissolving (collectively, the "Restricted Business").

1.5    Intent.  The Company shall always be operated in a manner consistent with its treatment as a "partnership" for federal and state income tax purposes.  The Company is not a "partnership" for purposes of the Arizona Uniform Partnership Act or a "limited partnership" for purposes of the Arizona Uniform Limited Partnership Act, and the Members are not partners.  It also is the intent of the Members that the Company not be operated or treated as a "partnership" for purposes of Section 303 of the federal Bankruptcy Code.  No Member shall take any action inconsistent with the express intent of the parties hereto.

1.6    Office.  The principal office of the Company shall be maintained at **[ (Attention: Visnu Patel)],** or at such other location or locations in Maricopa County, Arizona or elsewhere.

1.7    Registered Office and Agent for Service of Process.  The name and address of the agent for service of legal process on the Company in Arizona is [_____].  The Company's agent for service of legal process may be changed by the Manager upon written notice to all Members.  The  Manager shall comply, and the Members hereby agree to timely execute all documents and take all actions as determined by the Manager as may be necessary to comply

with the requirements of the laws of the State of Arizona, and any other applicable jurisdiction, for the formation, registration, continuation, qualification and operation of a limited liability company.

1.8    Term.  The term of the Company shall continue until the Company is dissolved in accordance with this Agreement.

1.9    Exculpation.  None of the Debtor, the Trustee, the Company, any Committee, or any of their respective members, officers, directors, trustees, employees, advisors, professionals, or agents (other than those Persons identified as a possible defendant on Exhibit B of the Plan) have or will incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Case, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence, and, in all respects, the Debtor, the Trustee, the Company, any Committee, and each of their respective members, officers, directors, trustees, employees, advisors, professionals, and agents (other than those Persons identified as a possible defendant on Exhibit B of the Plan) are entitled to rely on the advice of counsel with respect to their duties and responsibilities under the Plan.

SECTION 2.  MEMBERS;  CAPITAL  ACCOUNTS;  VOTING  AND  CAPITAL CONTRIBUTIONS

2.1    Members and Capital Contributions.  The name the Members are set forth on Schedule C.  On the Effective Date, each Member shall be treated as having cancelled all right, title and interest to any property previously held in the Debtor and to have received, in exchange therefore, the number and denomination of Units set forth opposite such Member's name on Schedule C in the column entitled "Units."  The Manager shall update Schedule C and the Company's books and records from time to time as necessary to reflect any Transfer of Units, in each case, duly effected in accordance with this Agreement.  The Manager shall also update Schedule C and the Company's books and records from time to time to reflect the change in mailing address, facsimile number or e-mail address for any Member that sends written notice of such to the Company.  Any amendment or revision to Schedule C made in accordance with this Agreement shall not be deemed an amendment to this Agreement.  Any reference in this Agreement to Schedule C shall be deemed to be a reference to Schedule C as amended and in effect from time to time.

2.2    Capital Accounts.  The Members' Capital Account balances as of the Effective Date shall be as set forth in the Debtor's books and records, and shall be adjusted thereafter as provided herein.

2.3    Value of Units.  The Units are intended and expected to have negative value.  The Company shall not redeem or repurchase the Units and no Member shall have the right to receive any return in respect of its Units or otherwise from the Company.  For the sake of clarity, unless the Claims of all of the Company Creditors (as defined herein) have been paid in full, the Members will not receive or retain any rights, property, or distributions of any value on account of their ownership of Units.

2.4     Voting.  No Member will be authorized to take any action, and will not be entitled any voting rights, pertaining to the Company's assets, financial affairs, management and operation of the Restricted Business.

2.5     Capital Contributions.  No Member shall be liable to make a Capital Contribution.

2.6     Liability of Members.  Except as agreed upon in writings signed by the Members, no Member shall be liable for the debts, liabilities, contracts or any other obligations of the Company.  Except as agreed upon in writing by the Members, and except as otherwise provided by the Act or by any other applicable state law, no Member shall be required to make any loan to the Company.

**SECTION 3.**  PAYMENT OF COMPANY CREDITORS

3.1     Payments.

3.1.1     Subject to the discretion of the Manager, the Company shall make payments to the Company Creditors, Pro Rata, of all Excess Cash within 30 days of the end of each fiscal quarter, in such order and in such amounts as set forth in the Plan.

3.1.2     Notwithstanding Section 3.1.1 hereof, pursuant to the Plan, the Manager shall manage payments made to the Company Creditors so as to reserve sufficient Excess Cash to make appropriate payments on account of any Disputed Unsecured Claim as if that Disputed Unsecured Claim were an Allowed Unsecured Claim on the Effective Date in the Maximum Amount.  If and when any Disputed Unsecured Claim becomes an Allowed Unsecured Claim, Excess Cash shall be used to make an appropriate payment to the holder of such Allowed Unsecured Claim.  If a Disputed Unsecured Claim becomes a Disallowed Unsecured Claim, all reserves of Excess Cash attributable to the holder of that Disputed Unsecured Claim are deemed to be available for Pro Rata distribution to the Company Creditors.

3.2     Withholding.  The Manager is authorized to withhold from the payments to the Company Creditors and to pay over to any federal, state, local or other government any amounts required to be so withheld pursuant to the Code or any provisions of any other international, federal, state or local law.

3.3     Undeliverable Distributions.  Payments to the Company Creditors shall be made by the Company: (a) at the addresses set forth on any proofs of claim filed by such Company Creditor (or at the last known addresses of such holders if no proof of claim is filed or if the Company has been notified of a change of address), (b) at the addresses set forth in any written notices of address changes delivered to the Company after the date of any related proof of claim, (c) at the addresses reflected in Schedule B if no proof of claim has been filed and the Company has not received a written notice of a change of address, or (d) at the addresses contained in the official records of the Company.  If any Company Creditor's payment is returned as undeliverable, no further payments to such Company Creditor shall be made unless and until the Company is notified of such Company Creditor's then current address.  Claims held by a Company Creditor whose payments are returned as undeliverable and who fail to notify the Company of their respective correct addresses within 90 days after such payments are returned to the Company as undeliverable shall be expunged, after which date all unclaimed property shall

be deposited into the Company's bank accounts, notwithstanding any federal or state escheat laws to the contrary, and shall be available as Excess Cash available for future payments pursuant to this Section 3. The Company shall not be required to attempt to locate any Company Creditor.

3.4 <u>Failure to Negotiate Checks</u>. Checks issued to a Company Creditor in respect of payments under the Plan shall be null and void if not negotiated within 120 days after the date of issuance. Any amounts returned to the Company in respect of such non-negotiated checks shall be held by the Company. Requests for reissuance of any such check shall be made directly to the Company by the Company Creditor with respect to which such check originally was issued. All amounts represented by any voided check will be held until the later to occur of: (i) nine months after the Effective Date and (ii) nine months after such voided check was issued, and all requests for reissuance by the Company Creditor in respect of a voided check are required to be made prior to such date. Thereafter, all such amounts shall be deposited into the Company's bank accounts, notwithstanding any federal or state escheat laws to the contrary, and shall be available as Excess Cash pursuant to this Section 3.

**SECTION 4.** DISTRIBUTIONS

4.1 <u>Distributions</u>. The Company shall not make any distributions to the Members unless the Claims of the Company Creditors have been paid in full. In the event the Company Creditors have been paid in full, the Manager shall distribute to the Members any Excess Cash in accordance with each Member's Percentage Interests.

4.2 <u>Withholding</u>. The Manager is authorized to withhold from distributions, or with respect to allocations, to the Members and assignees and to pay over to any federal, state, local or other government any amounts required to be so withheld pursuant to the Code or any provisions of any other international, federal, state or local law and must allocate any such amounts to the Members and assignees with respect to which such amount was withheld. All amounts withheld pursuant to this Agreement, the Code or any provision of any state, local or international tax law or treaty with respect to any payment, distribution or allocation made to the Members or assignees under this Agreement will be treated as amounts distributed to the Members and assignees pursuant to <u>Section 4</u> or <u>Section 10.2.3.2</u> of this Agreement for all purposes under this Agreement. If the Company reduces the amount ultimately distributed to a Member or a holder of a claim, whichever is the case, for amounts owed the Company, the amount treated as distributed shall equal the full amount to be distributed to the Member or the holder, whichever is the case. If the amount required to be withheld with respect to a Member exceeds the amount which otherwise would have been distributed to such Member (at the time the withholding occurs), such Member shall pay to the Company the amount of such excess within ten (10) days after the giving of written demand therefor by the Manager. If such Member (herein called a "<u>Delinquent Member</u>") shall fail to pay such excess within said ten-day period, then (i) interest shall accrue thereon at or equal to the lesser of eighteen percent (18%) per annum or the maximum rate permitted by law, (ii) such excess amount together with interest accrued thereon as aforesaid shall be a lien upon the Membership Interest of the Delinquent Member in favor of the Company and may be recovered from the first distributions to which the Delinquent Member would otherwise have been entitled from the Company until such excess amount is fully repaid together with interest thereon as aforesaid, and (iii) the Company, in addition to and without

limiting any of its other rights and remedies, may institute an action against the Delinquent Member for collection of such excess amount and interest; in any such action, the Company shall be entitled to recover, in addition to such excess amount and interest, all attorneys' fees, disbursements and court costs incurred by the Company in connection with its efforts to collect the amounts due from such Delinquent Member. In addition, such Delinquent Member shall indemnify and hold harmless the Company and each of the other Members and the Manager and the employees of the Company for, from and against all liabilities, losses, costs and expenses, including, without limitation, penalties imposed by the Internal Revenue Service or any state or local taxing authority, for failure to remit the required amount of taxes to the appropriate governmental authority.

4.3     Limitation.  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a distribution to any Member on account of its interest in the Company if such distribution would violate §18-607 of the Act or any other applicable law.

**SECTION 5.** TAX ALLOCATIONS

5.1     Allocation of Profits and Losses.  After giving effect in order and priority to Sections 5.2 through 5.8 hereof, Profits and Losses for each applicable period will be allocated among the Members in accordance with their Percentage Interests.

5.2     Limitation on Allocation of Losses.  Notwithstanding the provisions of Section 5.1 hereof, no Member shall be allocated Losses pursuant to Section 5.1 hereof to the extent such allocation would cause such Member to have an Adjusted Capital Account Deficit at the end of any fiscal year.  In the event Losses cannot be allocated pursuant to Section 5.1 hereof as a result of the limitation contained in the preceding sentence, then such Losses shall be allocated to the other Members to the maximum amount permissible pursuant to the provisions contained in the preceding sentence.

5.3     Qualified Income Offset.  If any Member unexpectedly receives any adjustments, allocation or distributions described in clauses (4), (5) or (6) of Regulations Section 1.704-1(b)(2)(ii)(d), items of Company income shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible; provided however that an allocation pursuant to this Section 5.3 shall be made only if and to the extent such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 5 have been tentatively made as if this Section 5.3 were not in this Agreement.  This Section 5.3 is intended to constitute a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d)(3) and shall be interpreted consistently therewith.

5.4     Minimum Gain Chargeback.  If there is a net decrease in Company Minimum Gain during a Fiscal Year, each Member will be allocated, before any other allocation under this Section 5, items of income and gain for such fiscal year (and if necessary, subsequent years) in proportion to and to the extent of an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Regulations Section 1.704-2(g)(2).

This Section 5.4 is intended to comply with the "minimum gain chargeback" provisions of Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

5.5     Member Nonrecourse Debt Minimum Gain Chargeback.  Notwithstanding any other provision of this Section 5, except Section 5.4 hereof, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year of the Company, each Member who has a share of the Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(i)(4) and 1.704-2(j)(2).  This Section 5.5 is intended to comply with the minimum gain chargeback requirements of Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

5.6     Nonrecourse Deductions.  All Nonrecourse Deductions includes any "excess" Nonrecourse Deductions and shall be allocated in accordance with the Member's Percentage Interests.

5.7     Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Member who bears (or is deemed to bear) the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(2).

5.8     Special Allocations.  Any special allocations of items of gain, income, loss, or deduction pursuant to Sections 5.2 through 5.6 shall be taken into account in computing subsequent allocations of Profits or Losses or items thereof pursuant to this Section 5 so that the net amount of any items so allocated and the gain, loss and any other item allocated to each Member pursuant to this Agreement shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 5 if such special allocations had not occurred.

5.9     Other Allocation Rules.

5.9.1     For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Manager using any permissible method under Code Section 706 and the Regulations thereunder.

5.9.2     The Members are aware of the income tax consequences of the allocations made by this Section 5 and hereby agree to be bound by the provisions of this Section 5 in reporting their shares of Company income and loss for income tax purposes.

5.9.3    For purposes of this Section 5 and the allocations of Profits, Loss, and items of gross income, deduction, gain and loss only, the term Member shall include any assignee of a Company interest.

**SECTION 6.** MANAGEMENT

6.1    <u>Management of Company</u>.

6.1.1    <u>General</u>.  Subject to the limitation set forth in Section 6.2., the right to manage, control and conduct the business and affairs of the Company shall be vested solely in the Manager.

6.1.2    <u>Duties</u>.  Subject to the limitation set forth in Section 6.2., the Manager shall be responsible for conducting the daily business affairs of the Company, for making the day-to-day operating decisions in carrying out the purposes, objectives and policies established by this Agreement and the Plan, and for acting on behalf of the Company.  The Manager shall devote such time to the Company and its business as is appropriate to carry out the Manager's responsibilities hereunder, but shall not be obligated to devote its full time efforts to the Company.  The Manager shall have the duty to exert commercially reasonable efforts in a prompt and businesslike manner to do, accomplish and complete, in accordance with this Agreement and the Plan, all of the following:

6.1.2.1    Appoint an individual to serve as the member of the board of ML Manager, LLC, an Arizona limited liability company;

6.1.2.2    Implement the Restricted Business;

6.1.2.3    Maximize the value and liquidate into Cash, all of the Company's non-Cash assets, without unduly prolonging the existence of the Company, which must wind down and dissolve pursuant to Section 10 hereof;

6.1.2.4    Control and manage all Company assets, including (a) selling assets and collecting proceeds; (b) filing, prosecuting, and settling claim objections; and (c) prosecuting and settling Avoidance Actions and Litigation Claims;

6.1.2.5    Make payments to the Company Creditors as set forth in Section 3.1 of this Agreement;

6.1.2.6    Engage any Professional necessary in the discretion of the Manager to assist in the administration of any asset of the Company, prosecution of Avoidance Actions and Litigation Claims, and as otherwise needed to carry out the Restricted Business, with any such Professionals to be paid from Excess Cash or on other terms to which the Company and the Professional agree;

6.1.2.7    Appropriate to carry out the business of the Company and to maintain the books of account and other records and to produce the reports required by the terms of this Agreement;

6.1.2.8   Pay, at the expense of the Company and to the extent Cash of the Company is available, all bills and expenses of the Company;

6.1.2.9   Cause all books of account and other records of the Company to be kept in accordance with the terms of this Agreement;

6.1.2.10   Prepare and deliver to the Company Creditors and each Member all reports required by the terms of this Agreement;

6.1.2.11   Maintain all funds of the Company in a Company account in a bank or banks located in Maricopa County, Arizona, and be the signatory to such accounts;

6.1.2.12   File any complaint or institute any proceeding at law or in equity in connection with enforcing the Company's rights under the Plan;

6.1.2.13   Undertake such actions as are necessary or desirable in order that the Company promptly complies with all material present and future laws, ordinances, orders, rules, regulations and requirements of all governmental authorities having jurisdiction which may be applicable to the Company, its assets, and the operations and management of the Company;

6.1.2.14   Amend this Agreement to correct minor clerical errors (as reasonably determined by the Manager) by sending substitute pages to all Company Creditors and Members;

6.1.2.15   Perform all other duties otherwise described in this Agreement to be carried out by the Manager and take all actions reasonably deemed necessary to carry out any of the above rights and duties.

6.1.3   <u>Designation and Removal of Manager</u>.  RB Liquidation Manager Corp., is the initial Manager of the Company.  The Manager may resign at anytime.  At any time during the term of the Company when there is no Manager, the Bankruptcy Court shall designate and appoint a new Manager of the Company.

6.1.4   <u>Signature Power of Manager</u>.  The Manager, acting alone and without the joinder of any other Member, shall have the power to execute and deliver documents and instruments of every type and nature on behalf of the Company, which shall be binding on the Company.  Any Person dealing with the Company may rely, without further inquiry, upon the identity of the Manager set forth in the Company's Articles at the time action is taken by or on behalf of the Company by the Manager, and may rely on a certificate signed by the Manager as to the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by the Manager or which are in any other manner germane to the affairs of the Company.

6.1.5   <u>Insurance</u>.  The Manager may purchase and maintain or cause to be purchased and maintained for the Company policies of insurance for the Company's operations, for protection of the Company's assets, as may be reasonably required to comply with third party requirements, and as the Manager deems important.  The liability of the Manager shall be

limited, and the Manager shall be indemnified for its acts, to the extent provided in Section 6.3 hereof.

      6.2   <u>Limitation to the Restricted Business</u>.  Notwithstanding any provision in this Agreement to the contrary, the Manager shall not be entitled to take any action which is inconsistent with the Restricted Business.

      6.3   <u>Limitations on Liability; Indemnity</u>.  No Member (including the Manager) or its Affiliates or their members, officers, directors, partners, stockholders, employees, contractors, advisors or consultants (each an "<u>Indemnitee</u>") shall be liable to the Company or the other Members for actions taken in good faith by the Indemnitee in connection with the Company or its Restricted Business.  The Company, its receiver or trustee shall indemnify, defend and hold harmless each Indemnitee, to the extent of the Company's assets (without any obligation of any Member to make contributions to the Company to fulfill such indemnity), from and against any liability, damage, cost, expense, loss, claim or judgment incurred by the Indemnitee arising out of any claim based upon acts performed or omitted to be performed by the Indemnitee in connection with the business of the Company, including without limitation attorneys' fees and costs incurred by the Indemnitee in the settlement or defense of such claim; provided that no Indemnitee shall be indemnified for claims based upon acts performed or omitted in an intentional breach of this Agreement or which constitute gross negligence, fraud or willful misconduct.

      6.4   <u>Compensation</u>

         6.4.1   <u>Reimbursement of Expenses of the Manager</u>.  The Manager shall be entitled to reimbursement from the Company for reasonable costs incurred by it in connection with the performance of its duties hereunder.  The Company's costs for such expenses shall be the amounts actually paid for any services, items or supplies to parties contracting directly with the Company.

         6.4.2   <u>Compensation</u>.  The Manager shall not be entitled to receive any compensation for its services.

      6.5   <u>Confidentiality</u>.  The Manager hereby agrees that, during the period that it serves as Manager under this Agreement and for a period thereafter ending on the later of the second anniversary of the termination of the Manager and the first anniversary of the dissolution of the Company, it will hold strictly confidential and not use any non-public information relating to the Company or any non-Cash asset of the Company of which it becomes aware in its capacity as the Manager.

**SECTION 7.**  BOOKS, RECORDS, REPORTS AND ACCOUNTING

      7.1   <u>Records</u>.  The Manager shall keep or cause to be kept at the specified office of the Company the following:  (a) a current list of the full name and last known business, residence or mailing address of each Member of the Company (b) a current list of the full name and last known business, residence or mailing address of each Company Creditor  (c) a copy of the initial Articles and all amendments thereto, (d) copies of all written operating agreements, including this Agreement, and all amendments to the operating agreements, including any prior written

operating agreements, no longer in effect of the Company (e) copies of the federal, state and local income tax returns and reports of the Company, its subsidiaries, (f) copies of all prepared operating statements, financial statements, reports, business plans in effect and annual budgets in effect and development budgets in effect, books and records of the Company, and (g) minutes of every meeting of the Members as well as any written consents of Members or actions taken by Members without a meeting for the Company. Any such records maintained by the Company may be kept on or be in the form of any information storage device, provided that the records so kept are convertible into legible written form within a reasonable period of time. Any Member or Company Creditor, or its designated representative shall have the right, at any reasonable time, to have access to and inspect and copy the contents of such books or records, which, upon request, shall be made available to such Member or Company Creditor at the Company's specified office in Arizona.

      7.2    <u>Fiscal Year and Accounting</u>. The fiscal year of the Company shall be the calendar year. All amounts computed for the purposes of this Agreement and all applicable questions concerning the rights of Members shall be determined using the cash method of accounting. All decisions as to other accounting matters, except as specifically provided to the contrary herein, shall be made by the Manager.

      7.3    <u>Annual Reports</u>. As soon as practicable, but in no event later than four months after the close of each fiscal year, the Manager shall make available to the Members and the Company Creditors as of the last day of that fiscal year reports containing unaudited financial statements on an accrual or cash basis (as determined by the Manager) of the Company for the fiscal year, and such reports shall include a balance sheet and a statement of cash flows.

      7.4    <u>Interim Reports</u>. The Manager shall provide the Members and the Company Creditors with interim written reports on a cash basis in such detail as the Members and Company Creditors may reasonably require setting out the progress and status of the business of the Company. In addition, as soon as practicable, but in no event later than 60 days after the close of each calendar quarter, the Manager shall cause to be furnished to the Members and the Company Creditors as of the last day of that calendar quarter reports containing unaudited financial statements of the Company for that calendar quarter, including a balance sheet and statement of income, and a project status report. The interim reports shall include all payments made to Company Creditors and the status of the Company's Excess Cash.

      7.5    <u>Preparation of Tax Returns</u>. The Manager shall arrange for the preparation and timely filing of all returns of Company income, gains, deductions, losses and other items necessary for federal and state income tax purposes and shall cause to be furnished to the Members the tax information reasonably required for federal and state income tax reporting purposes. The classification, realization and recognition of income, gain, losses and deductions and other items, for federal income tax purposes, shall be on that method of accounting as the Manager shall determine in its reasonable discretion with the advice of the Members and the Company's independent accountants.

      7.6    <u>Tax Elections</u>. The Manager may in its reasonable discretion determine, with the advice of the Company's independent accountants, whether to make any available elections pursuant to the Code.

7.7    Tax Controversies.    The Bankruptcy Court shall designate the "Tax Matters Partner" pursuant to the Code and such Tax Matters Partner is authorized and required to represent the Company in connection with all examinations of the Company's affairs by tax authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with the Tax Matters Partner and to do or refrain from doing any or all things reasonably required by the Tax Matters Partner to conduct those proceedings.  The Manager agrees to promptly notify the Members upon the receipt of any correspondence from any federal, state or local tax authorities relating to any examination of the Company's affairs.  The Tax Matters Partner shall be prohibited from entering into any settlement or arrangement on behalf of the Company with respect to any federal, state or local tax authorities without the express written approval of the Members.  The Tax Matters Partner shall be indemnified for its acts as the Tax Matters Partner to the extent provided in Section 6.3.

**SECTION 8.**  AMENDMENTS

8.1    Amendments.  Except as otherwise provided herein, this Agreement may not be amended, except by a written instrument signed by the Manager.

**SECTION 9.**  TRANSFER OF COMPANY INTERESTS; NEW MEMBERS; DEATH OF CURRENT MEMBER

9.1    General.    No Member shall sell, assign, pledge, hypothecate, encumber or otherwise voluntarily transfer by any means whatever ("Transfer") all or any portion of its interest in the Company (or permit any Person directly or indirectly holding any interest in such Member directly or indirectly to Transfer any part of such interest), except for Transfers permitted as described in Section 9.2 hereof.  A transferee of a Member's interest in the Company will be admitted as a Substituted Member only pursuant to Section 9.4 hereof. Any purported Transfer which does not comply with the provisions of this Section 9 shall be void and of no force or effect.

9.2    Permitted Transfers.    A Member may transfer or assign all or a portion of its Company interest to a Participant upon the consent of the Manager, which consent shall not be unreasonably be withheld, if:

(i)    The Member does not receive consideration or anything of value from the Participant as a result of the Transfer;

(ii)    the Transfer is exempt from the registration requirements of any applicable federal or state securities laws and the Company receives an opinion of counsel or other reasonable evidence satisfactory to the Manager confirming such exemption;

(iii)    the Participant to whom the Company interest is to be transferred agrees to be bound by the terms of this Agreement and such Participant executes an amendment that clarifies such Participants' obligations hereunder, in a form that is acceptable to the Manager; and

(iv)    the Transfer does not directly or indirectly result in the Company having more than five Members.

A transferee of a Company interest permitted under this Section 9.2 shall automatically be a Substituted Member after such transfer or transfers if such transferee assumes all the obligations of the transferor under this Agreement and the transferor acknowledges that it is not relieved of its financial obligations hereunder.

9.3     Assignee of Member's Interest.  If, pursuant to a Transfer of an interest in the Company by operation of law and without violation of Section 9 hereof (or pursuant to a Transfer that the Company is required to recognize notwithstanding any contrary provisions of this Agreement), a Person acquires an interest in the Company, but is not admitted as a Substituted Member pursuant to Section 9 otherwise, then, subject to Section 9.4 hereof, such Person:

9.3.1     shall be treated as an assignee of a Member's interest, as provided in the Act;

9.3.2     like current Members, shall have no right to participate in the business and affairs of the Company; and

9.3.3     shall share in distributions from the Company with respect to the transferred interest, on the same basis as the transferring Member.

9.4     Substituted Members.  Except as specifically provided in Sections 9.2, no Person taking or acquiring, by whatever means, the interest of any Member in the Company shall be admitted as a substituted Member in the Company (a "Substituted Member") without the written consent of the Manager, which consent may be withheld or granted in the sole and absolute discretion of the Manager.

9.5     Distributions in Respect of Transferred Interests.  If any interest in the Company is transferred during any accounting period in compliance with the provisions of this Section 9, all distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.

9.6     Death of a Current Member.  If any current Member dies prior to the dissolution of the Company pursuant to Section 10, such Member's estate, and any beneficiary of such Member's estate that subsequently receives an interest in the Company, shall be treated as an assignee and shall be entitled to the rights of an assignee as set forth in Section 9.3 hereof.

**SECTION 10.**          DISSOLUTION AND TERMINATION

10.1     Dissolution.  The Company shall dissolve upon the first to occur of any of the following events:

10.1.1     Upon the sale or other disposition or resolution of all or substantially all of the Company's non-cash assets including the resolution for cash o   f any Avoidance Actions and Litigation Claims.

10.1.2     The election by the Manager to dissolve the Company; or

10.1.3 Upon the entry of a decree of dissolution under the Act.

10.2 Winding Up.

10.2.1 Left Blank Intentionally.

10.2.2 Effect of Filing. After the dissolution of the Company, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of its business, but the Company's separate existence shall continue until articles of termination have been filed with the Arizona Corporation Commission or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.2.3 Liquidation and Distribution of Assets. Upon the dissolution of the Company, the Manager, or, if there is no Manager, the remaining Member(s), or a court-appointed trustee if there is no remaining Member, shall take full account of the Company's liabilities and assets and such assets shall be liquidated as promptly as is consistent with obtaining the fair value thereof. During the period of liquidation, the business and affairs of the Company shall continue to be governed by the provisions of this Agreement, with the management of the Company continuing as provided in Section 6 hereof. The proceeds from liquidation of the Company's property, to the extent sufficient therefor, shall be applied and distributed in the following order:

10.2.3.1 To the payment and discharge of all of the Claims of the Company Creditors and to the establishment of any necessary reserves; and

10.2.3.2 To the Members in accordance with their respective positive Capital Accounts, after giving effect to all contributions, distributions and allocations.

10.3 Deficit Capital Accounts. In no event shall a Member's negative or deficit Capital Account balance be considered a debt or obligation owed to the Company, nor shall any Member with a negative or deficit Capital Account balance have any obligation to restore such Capital Account by means of a Capital Contribution to the Company.

10.4 Articles of Termination. When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed to the Members, articles of termination shall be executed and filed by the Manager, or if there is no Manager, by the remaining Members, with the Arizona Corporation Commission.

## SECTION 11. MISCELLANEOUS

11.1 Notices. Any notice, payment, demand or communication required or permitted to be given by any provision of this Agreement shall be in writing and shall be delivered personally to the Person to whom the same is directed, sent by registered or certified mail, return receipt requested, addressed to the Manager, Member or Company Creditor at the address appearing below such Person's name on Schedule B or Schedule C, respectively, or by facsimile transmission to the "FAX" number set below such Person's name on Schedule B or Schedule C, respectively, or if to the Company, by notice to the Manager and each Member as herein

provided, or to such other address as the parties may from time to time specify by notice in accordance with this Section 11.1. Any such notice shall be deemed to be delivered, given and received for all purposes as of the date so delivered, if delivered personally or if sent by facsimile transmission, or, if sent by certified or registered mail, three days following the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, postage and charges prepaid.

11.2 <u>Binding Effect</u>. Except as otherwise provided in this Agreement, every covenant, term and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees and assigns.

11.3 <u>Construction</u>. Every covenant, term and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member.

11.4 <u>Time</u>. Time is of the essence with respect to this Agreement.

11.5 <u>Headings</u>. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

11.6 <u>Severability</u>. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

11.7 <u>Incorporation by Reference</u>. Every exhibit, schedule and other appendix attached to this Agreement and referred to herein is hereby incorporated in this Agreement by reference.

11.8 <u>Additional Documents</u>. Each Member, upon the request of any other Member, agrees to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

11.9 <u>Variation of Pronouns</u>. All pronouns and any variations thereof shall be deemed to refer to masculine, feminine or neuter, singular or plural, as the identity of the Person or Persons may require.

11.10 <u>Arizona Law</u>. The internal laws of the State of Arizona shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members.

11.11 <u>Waiver of Action for Partition</u>. Each Member irrevocably waives any right that such Member may have to maintain any action for partition with respect to any of the Company's property.

11.12 <u>Counterpart Execution; Facsimile Signatures; Electronic Signatures</u>. Pursuant to Section 1142(a) of the Bankruptcy Code and the Plan, all Members must execute and deliver this Agreement to the Manager within 10 days of the Effective Date. In the event any Member does

not execute and deliver the Agreement within 10 days of the Effective Date, the Manager is hereby authorized and directed as part of the Plan to execute the Agreement on behalf of such Member. This Agreement may be executed in multiple counterparts (by original, electronic or facsimile signature), each of which shall be deemed an original and all of which shall constitute one agreement. The signatures of the Manager or any Member to a counterpart shall be deemed to be a signature to, and may be appended to, any other counterpart.

11.13 <u>Power of Attorney</u>. Notwithstanding anything to the contrary contained in this Agreement, the Bankruptcy Court and each Member, for itself and its successor Members and transferees, hereby irrevocably constitutes and appoints the Manager with full power of substitution, as its and its successor Members' and transferees' true and lawful attorney-in-fact to execute this Agreement and the Certificate in accordance with the provisions of this Agreement, including the execution of the Members as required under Section 11.12. This power of attorney is coupled with an interest and will survive the transfer of an interest in the Company. This power of attorney is a durable power of attorney and will not be affected by subsequent disability or incapacity of the Member or its successor Members, assignees or transferees.

11.14 <u>Glossary</u>. For purposes of this Agreement, the following terms shall have the meanings specified in this Section 11.14:

"<u>Act</u>" means the Arizona Limited Liability Company Act, as amended from time to time (or any corresponding provisions of succeeding law).

"<u>Adjusted Capital Account Deficit</u>" means an amount with respect to any Member equal to the deficit balance in such Member's Capital Account at the end of the relevant fiscal year, after increasing the balance in such Member's Capital Account by any amount which such Member is deemed to be obligated to restore pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5). The foregoing definition of Adjusted Capital Account Deficit generally is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"<u>Affiliate</u>" means, with respect to any Person: (a) any Person directly or indirectly controlling, controlled by or under common control with such Person; (b) any Person owning or controlling 10% or more of the outstanding voting interests of such Person; (c) any officer, director, or general partner of such Person; or (d) any Person who is an officer, director, general partner, trustee or holder of 10% or more of the voting interests of any Person described in clauses (a) through (c) of this definition.

"<u>Agreement</u>" means this operating agreement, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Agreement as a whole, unless the context otherwise requires.

"<u>Allowed</u>" has the meaning given such term in the Plan.

"<u>Allowed Claims</u>" has the meaning given such term in the Plan.

"<u>Articles</u>" has the meaning given that term in Section 1.8 hereof.

"Avoidance Actions" has the meaning given such term in the Plan.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time.

"Bankruptcy Court" has the meaning given such term in the Plan.

"Capital Account" means, with respect to any Member or assignee, the Capital Account maintained for such Person in accordance with the following provisions:

(a)     To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 5, and the amount of any Company liabilities assumed by such Person or which are secured by any Property distributed to such Person.

(b)     To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 5, and the amount of any liabilities of such Person assumed by the Company or which are secured by any property contributed by such Person to the Company.

(c)     In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(d)     In determining the amount of any liability for purposes of (a) and (b) of this definition, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Manager shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributions or distributed property or which are assumed by the Company, a Member, or assignee), are computed in order to comply with such Regulations, the Manager may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Section 10 of this Agreement upon the dissolution of the Company. The Manager also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and assignees and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), and (ii) make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

"Capital Account Depreciation" shall mean for each calendar year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such fiscal year or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such fiscal year or other period, Capital Account Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such fiscal year or other period bears to such beginning adjusted tax basis.

"Capital Contribution" means, with respect to any Member, an amount of money and the net fair market value of any property (other than money) contributed to the Debtor.

"Cash" means currency, checks drawn on a bank insured by the Federal Deposit Insurance Corporation, certified checks, money orders, negotiable instruments, and wire transfers of immediately available funds.

"Chapter 11 Case" has the meaning given such term in the Plan.

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Committee" has the meaning given such term in the Plan.

"Company" has the meaning given that term in the introductory paragraph to this Agreement, but shall also include any limited liability company continuing the business of this Company in the event of dissolution as herein provided.

"Company Creditor" and "Company Creditors" have the meaning given such terms in Section 1.3.2 of this Agreement.

"Company Minimum Gain" has the meaning set forth in Regulations Section 1.704-2(b)(2) and is determined by computing with respect to each nonrecourse liability of the Company, the amount of gain (of whatever character), if any, that would be realized by the Company if it disposed (in a taxable transaction) of the Property subject to such liability in full satisfaction thereof, and by then aggregating the amounts so computed as set forth in Regulations Section 1.704-2(d).

"Disallowed" has the meaning given that term in the Plan.

"Disputed" has the meaning given such term in the Plan.

"Effective Date" has the meaning given that term in the introductory paragraph to this Agreement.

"Excess Cash" means, at any time, all Cash in the possession or under the control of the Company at such time (including proceeds received through operations, sales or other dispositions, refinancings and any and all other events); less Cash paid for the operational expenses, administrative expenses, attorneys' fees and expenses and other costs and expenses of

the Company, including without limitation, liabilities permitted under the Plan at the Effective Date and liabilities incurred following the Effective Date, all as reasonably determined by the Manager.

"Final Order" means an order or judgment of the Bankruptcy Court: (a) as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired, or as to which any right to appeal, petition for certiorari, reargue, or rehear has been waived in writing in form and substance satisfactory to the Debtor; and (b) if an appeal, writ of certiorari, or reargument or rehearing has been sought, as to which the highest court to which the order was appealed, or certiorari, reargument or rehearing was sought, has determined or denied the appeal, writ of certiorari, reargument, or rehearing, and the time to take any further appeal, petition for writ of certiorari, or move for reargument or rehearing has expired; but the filing of a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, with respect to the order does not prevent the order from being a Final Order.

"General Unsecured Claim" has the meaning given that term in the Plan.

"Gross Asset Value" shall mean, with respect to any Company asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the fair market value of such asset at the time of contribution to the Company, as determined by the contributing Member and the Company as reflected in this Agreement or another writing agreed to by all the Members;

(b)     The Gross Asset Value of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Members, as of the following times:  (A) the acquisition of an additional interest in the Company by any new or existing Members in exchange for more than a de minimis Capital Contribution if the Members determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; (B) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for an interest in the Company if the Members determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (C) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);  and

(c)     If the Gross Asset Value has been determined or adjusted pursuant to Subsections (a) and (b) above, such Gross Asset Value shall be thereafter adjusted by the Capital Account Depreciation taken into account for purposes of computing Profits or Losses.

"Indemnitee" has the meaning given that term in Section 6.4 hereof.

"Litigation Claims" has the meaning given such term in the Plan.

"Manager" means the Person identified as the Manager in the introductory paragraph to this Agreement, and any new Manager selected by the Bankruptcy Court pursuant to Section 6.1.2 hereof.

"Maximum Amount" has the meaning given such term in the Plan.

"Member" means any Person identified as a Member in the introductory paragraph to this Agreement. If any Person is admitted as Substituted Member pursuant to the terms of this Agreement, "Member" shall be deemed to refer also to such Person. "Members" refers collectively to all Persons who are designated as a "Member" pursuant to this definition.

"Member Nonrecourse Debt" has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Section 1.704-2(i)(3) of the Regulations.

"Member Nonrecourse Deductions" has the meaning set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Regulations.

"Nonrecourse Deductions" has the meaning set forth in Section 1.704-2(b)(1) of the Regulations.

"Nonrecourse Liability" has the meaning set forth in Section 1.704-2(b)(3) of the Regulations.

"Participant" has the meaning given such term in the Plan.

"Percentage Interest" means, with respect to each Member, the percentage identified on Schedule C as that Member's "Percentage Interest" in the Company.

"Person" means any individual, partnership, limited liability company, corporation, trust or other entity.

"Plan" means the Plan of Reorganization dated October 19, 2009, filed by the Debtor and confirmed by the Bankruptcy Court on **[insert date]**, as amended, modified or supplemented in accordance with the terms thereof.

"Professional" means a person: (a) employed in the Chapter 11 Case in accordance with an order of the Bankruptcy Court under Bankruptcy Code §§ 327, 328, 363, or 1103 and to be compensated for services under Bankruptcy Code §§ 327, 328, 329, 330, and 331 or order of the Bankruptcy Court; or (b) for whom compensation and reimbursement has been Allowed by a Final Order under Bankruptcy Code § 503(b).

"Profits" and "Losses" means, for each fiscal year or other period, an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code

Section 703(a) (including in such taxable income or loss all items of income, gain, loss or deduction required by Code Section 703(a) to be stated separately) with the following adjustments:

      (a)    Any income of the Company that is exempt from federal income tax, and not otherwise taken into account in this definition in computing Profits or Losses, shall be added to such taxable income or loss;

      (b)    Any Company expenditures described in Code Section 705(a)(2)(B), or treated as such pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in this definition in computing Profits or Losses shall be subtracted from such taxable income or loss, including nonrecourse deductions;

      (c)    Gain or loss resulting from any disposition of Company property shall be computed by reference to the Gross Asset Value of the Company property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value;

      (d)    In lieu of the depreciation, amortization and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account the "Capital Account Depreciation" computed in accordance with such definition contained above; and

      (e)    Notwithstanding any other provision of this subsection, any items of income, gain; loss or deduction which are specifically allocated shall not be taken into account in computing Profits or Losses.

"Pro Rata" means a proportionate share, such that the ratio of the consideration distributed on account of an Allowed Claim in a Class to the amount of that Allowed Claim is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims in that Class to the amount of all Allowed Claims in that Class.

"Regulations" means the Income Tax Regulations promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Restricted Business" has the meaning set forth in Section 1.4 hereof.

"Substituted Member" has the meaning given that term in Section 9.4 hereof.

"Tax Matters Partner" has the meaning given that term in Section 7.7 hereof.

"Transfer" has the meaning given that term in Section 9.1 hereof.

"Trustee" has the meaning given such term in the Plan.

"Withdrawal Event" means those events and circumstances listed in Section 29-733 of the Act.

IN WITNESS WHEREOF, the parties have entered into this Agreement as of the date first above written.

MANAGER:

RB LIQUIDATION MANAGER CORP.


By: _____
      Visnu Patel, President

Schedule A

**Plan of Reorganization**



Schedule B

**Company Creditors**



<u>Schedule C</u>

<u>Manager</u>:


RB Liquidation Manager, Corp.

**[Insert Address, Phone, Fax]**


| <u>Members</u>: | Percentage Interests | Units |
|---|---|---|
| Tom Hirsch **[Insert Address, Phone, Fax]** | 33.3% | 100 |
| Harish Shah **[Insert Address, Phone, Fax]** | 33.3% | 100 |
| Howard Walder **[Insert Address, Phone, Fax]** | 33.3% | 100 |